[No. S042278. June 27, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
MARY ELLEN SAMUELS, Defendant and Appellant.

**COUNSEL**

Joel Levine, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Kyle S. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BROWN, J.**—A jury convicted defendant Mary Ellen Samuels of the first degree murders of Robert Samuels and James Bernstein, soliciting the murders of Robert Samuels and James Bernstein, and conspiring to murder Robert Samuels and James Bernstein. (Pen. Code, §§ 187, subd. (a), 653f, subd. (b), 182, subd. (a)(1); hereafter all statutory references are to the Penal Code unless otherwise indicated.) The jury found true the financial gain special circumstance as to the murder of Robert Samuels, the multiple-murder special circumstance, and the allegation that a principal in the murder of Robert Samuels had used a firearm. (§§ 190.2, subd. (a)(1), (3), 12022, subd. (a)(1).)

The jury returned a death verdict for each murder. The trial court denied defendant's motions for a new trial and to reduce the penalty verdict. The court imposed a death sentence. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety.

## I. STATEMENT OF FACTS

### A. *Guilt Phase*

Defendant was married to Robert Samuels. On October 31, 1986, defendant filed for divorce. Even after the divorce proceedings were initiated, defendant and Robert Samuels were cordial, and defendant continued to work in the Subway restaurant she and Robert Samuels owned. However, by November 1988, just before his murder, Robert Samuels was depressed and had a less than friendly relationship with defendant.

On October 31, 1988—approximately two months before he was killed—Robert Samuels went to his divorce attorney, Elizabeth Kaufman, and signed a document seeking changes to his divorce agreement. Robert Samuels wanted to run the Subway restaurant because he was unemployed and felt he would be better at running the business. He also wanted to reduce spousal support payments below the $1,200 per month level because he was no longer able to pay that amount. The modification was never filed because Kaufman was waiting for Robert Samuels to complete a portion of the paperwork.

### 1. *The Solicitation and Murder of Robert Samuels*

Beginning in 1987, defendant solicited people to murder Robert Samuels on numerous occasions.

Anne Hambly, defendant's friend, testified defendant told her that after several attempts to find someone to kill Robert Samuels had failed, defendant was able to get James Bernstein to agree to commit the murder. Bernstein was dating defendant's daughter, Nicole Samuels. Bernstein was apparently angered when defendant told him that Robert Samuels had abused Nicole. A month before Robert Samuels was murdered, Bernstein said he wanted Samuels "taken care of permanently" because he was a child molester and batterer. He asked his employer, Charles Mandel, if he knew anyone who could "take care of it." Mandel provided Bernstein with the phone number of Mike Silva. Also, during November and December 1988, Bernstein asked a friend who owned a gun shop if he could get some weapons.

On December 7, 1988, defendant told Anne Hambly that Robert Samuels was dead and that she planned to "discover" his body in two days. On December 8, 1988, Nicole Samuels called her friend, David Navarro, and said "it's done" in reference to Robert Samuels's murder.

On December 9, 1988, the Los Angeles Fire Department responded to a call from Robert Samuels's home. Robert Samuels was found dead. He had been dead for over 12 hours and was killed by a shotgun blast fired into his head from close range. Samuels also suffered a blunt force trauma to his head that was a contributing factor to his death.

Defendant and Nicole Samuels were present when the police arrived. Defendant and Nicole worked to make it appear that there had been a struggle in the house. Defendant told the police she discovered Robert Samuels's body while dropping off the family's dog. Defendant sought to bolster this story by leaving messages on Samuels's answering machine regarding her plans to drop off the dog.

Anne Hambly testified that she also went to Robert Samuels's house the night he was found dead. Referring to the murder of Robert Samuels, defendant told Hambly that she could not believe that "it had finally happened" and that she had given Bernstein money six months earlier to arrange the killing. Defendant feared being caught and was also afraid to speak because she thought the police had "bugged" her car, purse, and home.

At trial, the prosecution introduced evidence showing defendant collected on several insurance policies after Robert Samuels's death. The total amount of these policies was in excess of $240,000. In addition, the prosecution introduced evidence that a sandwich shop owned by Robert Samuels and defendant was sold in early 1989, and defendant kept the proceeds of approximately $70,000. Additional evidence introduced by the prosecution showing how defendant benefited from Robert Samuels's death included: (1) defendant kept a car owned by Robert Samuels; (2) she received approximately $6,000 in uncashed payroll checks of Robert Samuels; and (3) she refinanced the family home after Robert Samuels's death, thereby gaining possession of an additional $160,000.

Defendant began to live a lavish lifestyle after Robert Samuels died. In addition, defendant made several incriminating statements after his death. For example, when asked by Anne Hambly who Mike Silva was, defendant told Hambly that Silva was hired by Bernstein to kill Robert Samuels. Defendant also told a friend, Marsha Hutchinson, that if she were not careful in her divorce proceedings, then Hutchinson's husband might decide to put a hit on her. Defendant also spoke and acted in a manner that led Bernstein's older brother and sister-in-law to believe that defendant had Robert Samuels killed.

James Bernstein also made incriminating statements after Robert Samuels's death. He told his employer, Charles Mandel, that Robert Samuels's murder had been taken care of and that he received money from defendant to pay Silva for his part in the crime.

## 2. The Solicitation and Murder of James Bernstein

On June 27, 1989, James Bernstein was killed. The circumstances leading to his murder are as follows: David Navarro and James Bernstein met in February 1989. Navarro testified he met Bernstein through Nicole Samuels, who was a friend of Navarro's girlfriend.

Navarro and Bernstein became friends and they sold drugs together until Bernstein disappeared in June 1989. Bernstein and Navarro were together once when Bernstein received a page, called the number he had been sent, and then went to meet Mike Silva. Bernstein referred to Silva as the "hit man."

Navarro made an anonymous call to the police and provided them with the phone number Bernstein received via the page and Mike Silva's name. Navarro also provided the names of defendant and Bernstein to the police. Los Angeles Police Officer John Birrer received Navarro's call on May 1, 1989. After Navarro provided this information, the police served search warrants. Police searched Bernstein's apartment on May 16, 1989, in connection with the murder of Robert Samuels. The police also searched the victim's house.

In late May or early June 1989, Bernstein told a friend, Rennie Goldberg, he was feeling remorseful and frightened of being caught. He wanted to confess his involvement in Robert Samuels's murder. By June 1989, Bernstein had become so afraid that he wanted to move out of the area. By the end of June 1989, Bernstein was ready to go to the police and admit what he knew. He told Navarro that he and Mike Silva had killed Robert Samuels and that defendant had paid them for it. He repeatedly said that defendant had solicited him to murder Robert Samuels. Bernstein stated that defendant wanted Robert Samuels killed for insurance money, and that one person had been paid but did not do the job so she approached Bernstein to see if he would do it. On June 26, 1989, Bernstein told his older brother that he was frightened and that he was the only person who could "burn Mary Ellen."

After Robert Samuels's murder, defendant told Anne Hambly that she wanted Bernstein killed because she thought he would go to the police and disclose her involvement in the murder. In March or April of 1989, Anne Hambly introduced Paul Gaul to defendant. Gaul was Hambly's live-in boyfriend. Hambly believed Gaul could help defendant with her trouble with Bernstein. Defendant and Gaul had several conversations about Robert Samuels's death. In the first conversation, defendant mentioned she received insurance money from Robert Samuels's death and that Bernstein was blackmailing her for her involvement in the murder. In the second conversation, defendant repeated the substance of the first conversation and added that she wanted Robert Samuels killed because he had abused Nicole and she wanted insurance money. During a third conversation, defendant mentioned a failed attempt to kill Robert Samuels. Defendant also said that she had paid for Robert Samuels's murder, but that the murder was done sloppily and that she had not expected it to be done in her house with blood everywhere.

Even in their first conversation, Gaul came to believe that defendant wanted his help in killing Bernstein. Gaul testified that it was not until a later conversation that defendant expressly asked Gaul for help. She told Gaul that she wanted Bernstein killed because he was blackmailing her. She also told

Gaul that Bernstein was selling drugs to children.[1] Defendant told Gaul that she would pay for Bernstein to be killed. Defendant spoke with Gaul five to 10 times about killing Bernstein, discussing payment two to four times.

Prior to Bernstein's murder, defendant called Gaul. She told Gaul that she was taking a trip to Cancun and wanted Bernstein murdered before she returned. Defendant agreed to pay Gaul $5,000 for killing Bernstein. Another form of payment was that defendant would forgive a loan made to Anne Hambly. To assist him in killing Bernstein, Gaul solicited Darryl Ray Edwards. Edwards agreed to kill Bernstein for $5,000.

In June 1989, at defendant's request, Bernstein moved in with Anne Hambly and Paul Gaul. When he moved out of his apartment, Bernstein told his apartment manager that he was moving out of town to avoid the police. Bernstein moved in with Hambly and Gaul because he was afraid the police were closing in on him.

On June 27, 1989, Paul Gaul and Darryl Ray Edwards killed James Bernstein. On that morning, Gaul met Edwards at a bar and they started drinking. Their plan to murder Bernstein involved getting Bernstein to go up to an area near Frazier Park. Gaul and Edwards planned to tell Bernstein that Edwards knew some drug dealers in Frazier Park and that Gaul, Edwards, and Bernstein would go and rob them.

The two men separated, planning to meet at Anne Hambly's later that day. Gaul returned to Hambly's house around 5:00 or 6:00 p.m. Edwards arrived approximately two hours later. Bernstein was at Hambly's house. Gaul, Edwards, and Bernstein talked about going to rip off drug dealers. Although he did not initially agree to the plan, Bernstein was curious and wanted more information. Subsequently, Gaul, Edwards, and Bernstein left Hambly's house in defendant's car. Gaul was the driver. After approximately 40 minutes, they ended up on an isolated dirt road. However, it turned out to be a private driveway and several dogs came running at the car. Edwards told Gaul to immediately get out of the driveway, so Gaul placed the car in reverse and drove away. About five to 10 minutes later, Edwards yelled "Now" or something similar. Gaul slammed on the car's brakes, put the car in park, and turned off the headlights. Edwards grabbed Bernstein's neck from behind and began to choke him. Bernstein began to scream, but Gaul twice hit him in the side of the head or neck to keep him quiet. Gaul accidentally hit Edwards, which loosened Edwards's grip on Bernstein. Bernstein opened the car door and jumped out. Edwards and Gaul got out of the car and chased

---

[1] Gaul testified that his brother had been killed by drug dealers and that he had been angered by it.

after Bernstein. Edwards caught Bernstein and wrestled him to the ground. Gaul held Bernstein's legs, while Edwards choked him. Bernstein asked, "Why?," and Gaul said that it was because he talked too much. Gaul stopped holding Bernstein's legs and joined in with Edwards. Bernstein struggled for three to five minutes, then stopped. Gaul put his ear to Bernstein's chest to listen for a heartbeat, but did not hear one. An autopsy on Bernstein confirmed that he had been strangled to death.

Gaul and Edwards placed Bernstein's body in the backseat of the car. Edwards drove to a dark and isolated area. During the drive to this area, Gaul took off Bernstein's belt, which had the name "James" on it, and threw it over a cliff. Gaul also threw Bernstein's pager over an embankment.

When Edwards stopped the car, he and Gaul pulled Bernstein's body out of the backseat and put it over an embankment. Gaul and Edwards then drove back to Anne Hambly's house. Upon returning to Hambly's house, Gaul, Edwards, and Hambly discussed what had happened. Gaul and Edwards told Hambly that they had killed Bernstein.

Anne Hambly made a phone call to defendant, who was in Cancun, Mexico, at the time, and let her know that Bernstein was dead. Hambly did so by using a "code" that she and defendant had agreed to. The code involved Hambly's calling defendant to say that Hambly had spoken to her sister. This statement was a signal to defendant that Bernstein was dead and that it was safe for defendant to return from Mexico.

### 3. *Defense Case*

The defense case centered on defendant's testimony and the testimony of her daughter, Nicole. Defendant testified that her six-year marriage to Robert Samuels had been stormy. Defendant claimed Samuels developed a drinking problem and was abusive when he drank.

Defendant testified that she moved out of her residence with Robert Samuels on October 3, 1986, because of Samuels's drinking. According to defendant, during the separation period, she and Samuels were able to generally agree on subjects, such as custody, child and spousal support, as well as the operation of the couple's Subway restaurant. Defendant testified that she considered reconciling, but decided not to when she learned that Samuels had physically and sexually abused Nicole.

Despite learning that Robert Samuels had physically and sexually abused Nicole, defendant testified she never wanted to kill Samuels and never asked anyone else to do so. She also denied involvement in any physical attacks on

Samuels, including an incident where she allegedly struck Samuels with a pipe. She also testified that her financial situation in 1987 was fine, even after her separation from Samuels.

With respect to Robert Samuels's murder, Nicole Samuels denied any involvement in a plot to murder him. She testified that Robert Samuels physically and sexually abused her and that she moved out of her family's home because of this abuse. Nicole stated that she did not tell her mother of the abuse until after the couple had separated because she was afraid that the couple would separate for this reason. Although she testified that she told several people, including friends and a school counselor, about these incidents, she never reported the abuse to law enforcement officials.

With respect to the murder of James Bernstein, Nicole testified that she and Bernstein met at a party in the beginning of 1986. Bernstein would subsequently visit the Subway restaurant where Nicole worked and she and Bernstein developed a friendship. For her part, defendant testified that she started to socialize with Bernstein toward the end of 1986. With respect to the prosecution's allegation that she was concerned with Bernstein speaking to the police about Samuels's murder, defendant testified she was not concerned because she had nothing to do with the murder. She stated that Bernstein never threatened or blackmailed her and that she did not want him dead, let alone conspire to have him killed. Defendant testified she felt terrible upon learning Bernstein was dead.

### B. *Penalty Phase*

Susan Conroy, Robert Samuels's sister, was the only witness the prosecution presented during the penalty phase. She testified with respect to victim impact evidence and described her good relationship with Robert Samuels.

Defendant offered the testimony of several witnesses who attested to her good character.

Myrna Aaron, an outreach worker for the Jewish Committee for Personal Service, visited defendant on an ongoing basis. Aaron found defendant to be a sensitive person and able to cheer up others despite her own circumstances. Aaron testified that defendant would be an "invaluable source of support" for other inmates if she were allowed to live.

Dawn Goodall, a fellow county jail inmate of defendant, testified that defendant was a "wonderful woman" who would do much more for others if allowed to live. She testified that defendant never exhibited a temper and tried to break up altercations between inmates.

Jacquelyne Gunn was defendant's fellow inmate for almost two years. Gunn testified that defendant would give Bible study classes almost every night. Gunn testified that when she could not afford to buy an item while in prison, defendant would buy it for her with no expectation of anything in return. Gunn also stated that defendant helped sick inmates by giving them soup, water, and warm towels. Gunn confirmed that defendant would help defuse altercations between inmates. Gunn also testified about an incident in prison when she received bad news and became suicidal. Gunn called for defendant, and her presence spiritually comforted and made Gunn feel safe. Gunn said that defendant aligned herself with weaker inmates and her friends were all people of color. Gunn asked the jury to let defendant live.

Defendant's childhood friend, Barbara Favilla, testified that defendant was fun to be with and easy to get along with. Favilla testified that she wanted to see defendant get a life sentence.

Defendant's first husband, Ronnie Lee Jamison, testified about their marriage. Citing their good marriage and her redeeming values, Jamison asked the jury to spare defendant's life.

Stephanie Hughes, defendant's former stepdaughter, testified that defendant had treated her as if she were her own daughter and that they had a great relationship. Hughes also asked the jury to allow defendant to live.

Ellen Gurnick, defendant's mother, testified that she had throat cancer and would be going into surgery the next day. She testified that defendant had a normal childhood, was a popular girl, and a good enough actress to get the lead part in a high school drama production. Although Mrs. Gurnick had not seen defendant much since Robert Samuels's death, she testified that she and defendant frequently communicated via the telephone and mail. She asked the jury to spare defendant's life.

Alexander Gurnick, defendant's father, testified about defendant's numerous friendships as a girl. He recalled defendant babysitting for her younger brother while he and his wife worked. He asked the jury to let defendant live.

In addition, three sheriff's deputies testified on defendant's behalf. Timothy Murakami, Gary Mann, and Dennis Ransom testified that they had experienced no problems with defendant during her incarceration, although on cross-examination, Murakami testified he believed defendant was a manipulative person.

## II. Discussion

### A. *Pretrial Issues*

#### 1. *Denial of* Pitchess *Requests*

Defendant moved for discovery of the personnel records for former Police Officer James Nowlin and Detective George Daley, which the trial court denied.

■ Evidence Code sections 1043 and 1045, which codified our decision in *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305], allow discovery of certain relevant information in peace officer personnel records on a showing of good cause. Discovery is a two-step process. First, defendant must file a motion supported by declarations showing good cause for discovery and materiality to the pending case. (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 82 [260 Cal.Rptr. 520, 776 P.2d 222].) This court has held that the good cause requirement embodies a "relatively low threshold" for discovery and the supporting declaration may include allegations based on "information and belief." (*Id.* at p. 94.) Once the defense has established good cause, the court is required to conduct an in camera review of the records to determine what, if any, information should be disclosed to the defense. (Evid. Code, § 1045, subd. (b).) The statutory scheme balances two directly conflicting interests: the peace officer's claim to confidentiality and the defendant's compelling interest in all information pertinent to the defense. (*City of San Jose v. Superior Court* (1993) 5 Cal.4th 47, 53 [19 Cal.Rptr.2d 73, 850 P.2d 621].) Here, the trial court denied defendant's *Pitchess* motions. Defendant claims the court erred in denying the motions and this error also violated her constitutional rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

#### a) *James Nowlin's records*

Although James Nowlin was not involved in the murder investigation of Samuels or Bernstein, defendant sought Nowlin's records from the Costa Mesa Police Department where Nowlin had been a reserve police officer. Defendant asserted that Nowlin was violent and unstable and had a motive to kill Robert Samuels. In support of her request, defendant alleged numerous facts including: (1) Nowlin was initially investigated as a suspect in Samuels's death because Samuels had a brief sexual relationship with Nowlin's estranged wife and Nowlin was known to be jealous and violent; (2) Nowlin owned shotguns and had been suspended from the Costa Mesa Reserve Police Officer Program because he fired a handgun during an argument with his wife and then lied about the incident; (3) a former

policeman reported that Nowlin's girlfriend had told him that Nowlin said he had done "something very bad and that he could go to prison for a long time," and that Nowlin had asked the girlfriend to give him an alibi; (4) Nowlin reconciled with his wife on the day that Samuels's body was discovered.

The trial court denied the motion, holding that defendant failed to lay a proper foundation under *Pitchess*. Here, even if the trial court erred because defendant made a showing of good cause in support of his request (see *Warrick v. Superior Court* (2005) 35 Cal.4th 1011 [29 Cal.Rptr.3d 2, 112 P.3d 2]), such error was harmless in light of the extensive evidence linking defendant to the murders of Samuels and Bernstein. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### b)  *Detective Daley's records*

George Daley was the homicide detective assigned to the Samuels case. With respect to Daley, defendant claims his files "might have led to discovery of prior instances of improper sexual advances, as the defense asserted he had made toward defendant. Moreover, the request sought to examine prior instances of dishonesty on any matter, which might have detracted from Daley's credibility." The trial court reviewed Daley's records in camera and concluded there was nothing to disclose. Regarding Daley's file, the records were made part of the record on appeal but were sealed, and appellate counsel has not been permitted to view them. We have independently examined the materials and conclude the trial court did not abuse its discretion by refusing to disclose the contents of Daley's personnel files. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039 [130 Cal.Rptr.2d 672, 63 P.3d 228].)

### 2.  *Failure to Conduct Individual Sequestered Voir Dire*

The trial court rejected defendant's request to question each juror individually on the issue of the death penalty. Defendant contends that as a result the trial court's voir dire did not allow the parties to make intelligent decisions about whether a prospective juror was qualified to sit as a juror. Defendant claims this error violated her constitutional rights under the Sixth and Fourteenth Amendments of the United States Constitution.

Contrary to defendant's contention that the trial court improperly restricted voir dire, the record shows the trial court's voir dire was adequate. The trial court asked the appropriate death-qualifying questions required by *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] and *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], lengthy juror questionnaires were completed, and both sides had the opportunity to question each prospective juror. There is no indication that the trial

court abused its discretion during voir dire. (*People v. Burgener* (2003) 29 Cal.4th 833, 865 [129 Cal.Rptr.2d 747, 62 P.3d 1].)

Defendant also argues that she was entitled to individually sequestered voir dire pursuant to our decision in *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301], and that the trial court erred in denying her request. As in the past, we reject this argument. Proposition 115, passed June 5, 1990, enacted Code of Civil Procedure former section 223, which abrogated our decision in *Hovey.* (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1198–1199 [120 Cal.Rptr.2d 477, 47 P.3d 262].)

### 3.  Removal of Prospective Juror Robert P.

Defendant contends the trial court erroneously excused Prospective Juror Robert P. for cause. Defendant claims this error violated her federal constitutional rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

The United States Supreme Court has stated that the proper standard to excuse a juror for cause based on his or her views on capital punishment is "whether the [prospective] juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt, supra,* 469 U.S. at p. 424.)

In his juror questionnaire Robert P. provided a series of contradictory answers to questions regarding his views on the death penalty. For example, although he indicated that the state should impose the death penalty on everyone who intentionally kills another person, Robert P. admitted that he might be tempted to find special circumstances to be false, no matter the evidence presented, in order to avoid the death penalty question. Robert P. was also uncertain if he could set aside his own feelings regarding what the law ought to be and follow the law as set forth by the court. When asked how he would address a conflict between an instruction of law and his own belief or opinion, Robert P. wrote, "Certain beliefs I hold strongly. For those I would have to talk to him. I may not be willing to bend." Finally, on the final page of his questionnaire, Robert P. wrote: "I feel the death penalty should be used in certain cases. I do not think I could be the one to pull the switch. I have thought much about how I would handle evidence that pointed to the death penalty. I would vote for it, but I would not feel good about it. I cannot say until actually faced with the situation, but I might become hesitant as the issue turns from abstract discussion to reality."

During oral voir dire, Prospective Juror Robert P. also made contradictory statements about his ability to follow the law. He initially stated he was

willing to set aside his own views and follow the law. However, when asked further about putting aside his personal feelings and following the law as explained by the court, Robert P. admitted that "there's certain things that I wouldn't be willing to bend on . . . . I don't know if any of those things are going to come up in this case, but I just wanted to leave the door open just in case to say that some things might happen. Mostly this has to do with my religious beliefs." Further, when the prosecutor asked if there were any situations where he would be unwilling to follow the court's instructions, Robert P. stated, "Yes. And I don't know of an example to bring up, but . . . maybe something might." Based on our review of the record, we find no federal error in the trial court's excusing Robert P. for cause. (*Wainwright v. Witt, supra*, 469 U.S. at p. 424.)

## B.   *Guilt Phase Issues*

### 1.   *Alleged Error in Admitting Evidence of Defendant's Bad Character*

Defendant sets forth numerous instances of alleged trial court error in admitting character evidence. Defendant claims these evidentiary errors violated her due process and fair trial rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. With respect to many of these claims,[2] such as those showing the lavish lifestyle defendant enjoyed after Robert Samuels's death, there was no error. The evidence was relevant to prove defendant's financial motive for killing Samuels. (*People v. Sapp* (2003) 31 Cal.4th 240, 313 [2 Cal.Rptr.3d 554, 73 P.3d 433].)

In addition, certain evidence was properly admitted to rebut defendant's claim that defendant was upset about Robert Samuels's death. (See, e.g., *People v. Raley* (1992) 2 Cal.4th 870, 913 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1131 [74 Cal.Rptr.2d 121, 954 P.2d

---

[2] As noted above, these claims relate to evidence that after Robert Samuels's death defendant not only lived a lavish lifestyle and made extravagant purchases, she was callous and indifferent to Samuels's death. Evidence of defendant's extravagant purchases included a new Porsche automobile; costly custom clothing from a store called Trashy Lingerie; scuba equipment for Dean Groover; a 30-inch television and a car phone; and a fur coat. Additional evidence of defendant's lavish lifestyle included a trip to Mexico and the purchase of property in Cancun, Mexico; a financial investment in Groover Productions; paying for the cost of others to travel to Las Vegas, San Francisco, and Cancun; being free with her money; throwing a birthday party for herself at a country club; using limousines for transportation; and expending most, if not all, of the money she received from Robert Samuels's death within one year. Evidence of defendant's callousness and indifference included defendant's posing for a photograph while covered only in money; commencing a relationship with Dean Groover; forging Robert Samuels's mother's signature; and refinancing the home she inherited after Samuels's death and providing fraudulent information on the related loan documents.

384].) This included evidence showing that defendant did not pay for Samuels's funeral and that she did not give Samuels's car or money to his brother, and testimony from police officers who were present at the crime scene that related how defendant dressed and acted provocatively. In addition, defendant failed to object to the admission of this evidence, so any claims with respect to this evidence are waived. (*People v. Lewis* (2001) 25 Cal.4th 610, 673 [106 Cal.Rptr.2d 629, 22 P.3d 392].)

Also, the prosecution's questioning of Nicole Samuels about the possibility she stole proceeds from the Subway restaurant was not error because it was relevant to the prosecution's cross-examination of Nicole with respect to her credibility.

With respect to evidence relating to defendant's dressing in an unseemly manner and her attempt to teach a bird how to call Detective Daley derogatory names, the trial court erred in admitting this evidence, but such error is harmless. (*People v. Watson, supra*, 46 Cal.2d at p. 836.)

As to the remaining instances of alleged error in admitting character evidence, even if the evidence was admitted in error, any error was harmless in light of the prosecution's extensive case against defendant.[3] (*People v. Watson, supra*, 46 Cal.2d at p. 836.)

Finally, after reviewing the record on appeal, we believe that any evidentiary error by the trial court, cumulative as well as individual, was harmless. The prosecution presented other evidence that overwhelmingly linked defendant to the murders of Robert Samuels and James Bernstein. This evidence included testimony from Anne Hambly and Paul Gaul, one of Bernstein's admitted killers, both of whom implicated defendant in the murders. It is not reasonably probable the jury would have reached a different result had the evidence been excluded. The evidence about which defendant complains shows her to be an indifferent, self-indulgent, and careless parent who set a poor example. It added little to the compelling case against her.

---

[3] These instances include: defendant requested that Paul Gaul steal paperwork for her in Mexico; defendant attended bars and clubs; defendant received pornographic letters; defendant used drugs; defendant allowed her daughter to drop out of high school; defendant allowed her daughter to leave the family home at age 16; defendant took her minor daughter and her minor friends to bars; defendant's daughter and her daughter's friends used drugs supplied by defendant while at defendant's house; defendant influenced her daughter and her daughter's friends to dress inappropriately; defendant allowed her daughter to take a trip to Mexico with James Bernstein; defendant's daughter allowed herself to be photographed in a suggestive position; defendant's daughter refused to return or pay for jewelry she had "hocked" that had been bought for her by James Bernstein with David Navarro's credit and suggested that a false insurance claim be made; defendant's daughter was engaged to James Bernstein while engaged to another man.

Accordingly, any evidentiary error was harmless. (*People v. Watson, supra*, 46 Cal.2d at p. 836.) Assuming defendant's constitutional claims are preserved, they fail "because generally, violations of state evidentiary rules do not rise to the level of federal constitutional error." (*People v. Benavides* (2005) 35 Cal.4th 69, 91 [24 Cal.Rptr.3d 507, 105 P.3d 1099].)

## 2. *Alleged Judicial Bias*

■ Defendant contends the trial court made inconsistent evidentiary rulings, thereby demonstrating the court's bias, and depriving her of her constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Failure to raise the issue of judicial conduct at trial waives claims of statutory or constitutional error. Because defendant failed to raise a proper objection, the issue is waived on appeal. (*People v. Wright* (1990) 52 Cal.3d 367, 411 [276 Cal.Rptr. 731, 802 P.2d 221].) In any event, as set forth below, after reviewing these rulings, we reject defendant's claim of judicial bias. (*People v. Clark* (1992) 3 Cal.4th 41, 143 [10 Cal.Rptr.2d 554, 833 P.2d 561].)

### a) *Handwriting exemplar of Nicole Samuels*

Defendant claims the trial court erred by preventing Nicole Samuels from providing a handwriting exemplar. As a result of this alleged error, defendant claims she was prevented from rehabilitating Nicole. We disagree. On cross-examination by the prosecution, Nicole admitted to signing some checks she gave to James Bernstein. On redirect examination, defense counsel asked Nicole if she would be "willing, if asked by the prosecution, to give your handwriting exemplar so it might be matched." The prosecutor objected on relevance grounds and the trial court upheld this objection. Defense counsel attempted to have the judge reconsider his ruling, but he stated, "You can have a handwriting expert do the same thing. You are forcing one side to do the other person's work." There was no error and defendant sets forth no reason for how she was prevented from introducing the evidence.

### b) *Cross-examination of Detective Daley*

Defendant claims that on direct examination Detective Daley testified that he never told witnesses or suspects any specifics about the status of the investigation or evidence recovered. During defendant's testimony, defense counsel attempted to elicit testimony about references Daley made concerning the investigation. The prosecutor objected on hearsay grounds and the court sustained the objection. Defendant claims the prosecutor promised Detective Daley would be recalled and asked about any disclosures. Detective Daley

was recalled by the prosecution, but defendant complains the prosecutor failed to ask Detective Daley about any disclosures and the trial court's rulings in this context supporting the prosecution exhibited bias. This claim lacks merit. Defendant had the opportunity to thoroughly cross-examine Detective Daley on this issue and to impeach his credibility, yet failed to do so.

c)   *Disclosure of investigator's interview notes*

The prosecution called John Krall as a witness to testify about an incident where defendant allegedly struck Robert Samuels with a pipe. Defendant sought to impeach Krall with questions relating to an interview Krall had with a defense investigator. At trial, the prosecution requested the defense disclose any interview notes it had with respect to this interview. Defense counsel objected, claiming that he did not intend to call the investigator as a witness or refer to the notes. Initially, the trial court ruled defendant must disclose the interview notes. However, the trial court ruled it would examine the written notes to determine if the notes contained any work product or material protected by the attorney-client privilege. After doing so, the trial court held that there was no work product or privileged material and that defendant was required to turn over the notes.

Even if the trial court erred in requiring the defendant to turn over the notes to the prosecutor (see *People v. Sanders* (1995) 11 Cal.4th 475, 520 [46 Cal.Rptr.2d 751, 905 P.2d 420]), in light of the overwhelming evidence against defendant, such error was harmless. (*People v. Watson, supra,* 46 Cal.2d at p. 836.) In addition, any erroneous evidentiary ruling by the trial court does not show that the court was biased. (*Kreling v. Superior Court* (1944) 25 Cal.2d 305, 312 [153 P.2d 734]; *Scott v. Family Ministries* (1976) 65 Cal.App.3d 492, 510 [135 Cal.Rptr. 430] ["A possibly erroneous ruling on evidence does not establish prejudice of the trial judge"].)

d)   *Alleged improper denial of defendant's right to*
       *cross-examine prosecution witness David Navarro*

On cross-examination of David Navarro, defendant inquired about his immunity agreement with the prosecution. During the course of this cross-examination, defendant asked Navarro his opinion as to "who was the person who determines whether your testimony is truthful?" The prosecutor objected on the grounds that the question was asked for a legal conclusion and an improper opinion. The trial court sustained the objection. Defendant claims she was precluded from properly cross-examining Navarro because of this ruling and that this ruling exemplified the court's bias. We disagree. When the trial court sustained the prosecution's objection, defense counsel did not

object to this ruling. Rather, he continued with his spirited cross-examination of Navarro, including further questions with respect to his immunity agreement with the prosecution. There is no showing of judicial bias in this ruling nor that defendant suffered any prejudice in cross-examining Navarro.

### e) *Impeachment of Anna Davis*

On direct examination, defense witness Anna Davis testified that when she was in a limousine with defendant, Heidi Dougall, and Anne Hambly, she saw Dougall and Hambly use cocaine. On cross-examination, the prosecution inquired into Davis's use of cocaine. Defendant objected to this line of questioning claiming it was improper impeachment. After appointing counsel for Davis, the trial court allowed the prosecution to continue with this line of questioning. The trial court did not commit error. As set forth above, Davis testified on direct examination on cocaine use by Dougall and Hambly in a limousine, so defendant initially raised the issue. On cross-examination, Davis admitted that she and defendant also used cocaine with Dougall and Hambly. The trial court properly allowed the cross-examination into Davis's cocaine use because it was relevant to Davis's credibility. Again, defendant fails to show how this ruling shows judicial bias.

### f) *Cross-examination of prosecution witness Heidi Dougall*

Defendant attempted to cross-examine Heidi Dougall by inquiring about her psychiatric hospitalization and attempted suicide. The prosecution objected on the grounds that Dougall's credibility was at issue, not her mental health. Defendant claims the trial court was biased because it refused to permit any reference to Dougall's hospitalization or attempted suicide.

■ "[T]he mental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, if such illness affects the witness's ability to perceive, recall or describe the events in question." (*People v. Gurule* (2002) 28 Cal.4th 557, 591–592 [123 Cal.Rptr.2d 345, 51 P.3d 224].) Here, the record contradicts defendant's claims that she was not permitted to adequately cross-examine Dougall. The trial court ruled that it was appropriate to ask Dougall whether she had taken any medications, drugs, or alcohol that could have influenced her observations. The trial court allowed defendant to inquire whether Dougall had taken any medications that changed her powers of recollection. Defendant was allowed to ask Dougall whether she was in the care of doctors, but not if she was ever institutionalized. The trial court disallowed defendant's questioning about Dougall's suicide attempt, stating that it was irrelevant unless defendant could show some factor in the case was related to it. Defendant promptly proceeded with her cross-examination of Dougall,

asking questions with respect to her treatment by doctors and her medical condition between July 1988 and December 1989.

Based on our review of the record, the trial court correctly limited defendant's cross-examination to questions relevant to Dougall's credibility, and defendant's claim that she was precluded from making any inquiry about Dougall's medical condition lacks merit. Thus, there was no showing of bias with respect to the court's rulings on Dougall.

### g) *Admission of check*

The trial court admitted into evidence a $1,500 check drawn from defendant's personal account dated October 17, 1989, and made out to "cash." Defendant objected on relevance grounds and that no foundation had been laid for the check's admission. On appeal, defendant claims this ruling was erroneous and exhibited the trial judge's bias. This claim lacks merit. The check was relevant because the prosecutor set forth that the financial gain circumstances involved in the case were still pending when this check was dated, and the check therefore supported the prosecution's theory of the case. But we agree with defendant that the record is less than clear that the prosecutor laid a proper foundation for the admission of the check. However, even if the trial court erred in admitting this evidence, such error was harmless in light of the extensive evidence against defendant and the minor effect this check would have on the jury. (*People v. Watson, supra*, 46 Cal.2d at p. 836.)

### h) *Alleged threats to defense counsel*

Defendant called her daughter, Nicole Samuels, as a witness. Nicole testified that she had been sexually abused by Robert Samuels. On cross-examination, the prosecutor attempted to attack Nicole's credibility by asking her why she waited until May 1994 to reveal this information. On redirect examination, defendant sought to introduce testimony from Nicole about statements she made during interviews with defense investigator Marty Jensen with respect to the alleged sexual abuse.

Outside the presence of the jury, the prosecutor objected, claiming that defendant failed to turn over any discovery statement pursuant to section 1054.3. Defense counsel responded by stating no written statement from the interview existed, so there was no disclosure requirement. After defense counsel admitted prior knowledge about Nicole's statements to the investigators, the trial court noted its frustration at defense counsel for springing this information on the court during the trial. However, the trial judge never made any threats that exhibited bias. Although the trial judge said he would

consider monetary sanctions, he concluded they would not be effective. In fact, the trial court did not prohibit the defense counsel from asking questions about the interview. Rather, the record reflects defense counsel withdrew his question about Nicole's interviews with the investigator because he realized it would allow the prosecution to elicit testimony from the investigator stating that she did not take any notes because she was following the express instructions of former counsel. Defense counsel therefore withdrew his question, not because of threats or intimidation by the trial judge, but for strategic purposes.

### i) *Alleged improper impeachment of Nicole Samuels*

Defendant claims the trial court erred by allowing Detective Daley's rebuttal testimony relating to Nicole Samuels's refusal to provide any information to the police about her alleged sexual abuse by Robert Samuels. Daley testified that Nicole had refused to cooperate, claiming the attorney-client privilege. The defense objected to this testimony on the grounds that it was improper rebuttal because it exposed the jury to learning that Nicole had exercised her Fifth Amendment rights. The prosecution claimed that because Nicole testified that she had told Daley about the sexual abuse, Daley's testimony was highly relevant to Nicole's credibility.

Over defendant's objection, the trial court allowed this testimony, stating it was a "prior inconsistent or consistent statement" with Nicole's prior testimony that went to the issue of credibility. Defendant alleges that because of this ruling the trial judge "continued its role as either chief prosecutor or at least co-prosecutor." We disagree. There was no error in the ruling, and even if the trial court erred in this ruling, there is no showing of bias. The record shows that after considering the parties' arguments the trial court simply made an evidentiary ruling. (*Kreling v. Superior Court, supra,* 25 Cal.2d at p. 312; *Scott v. Family Ministries, supra,* 65 Cal.App.3d at p. 510.)

### j) *Exclusion of Jeffrey Weiss's testimony*

Defendant claims the trial court exhibited bias by excluding the testimony of Jeffrey Weiss. Defendant claims Weiss would have testified with respect to an incident where he heard Nicole Samuels shout at Robert Samuels, "Keep your hands off me. I don't want you to touch me." Without analysis, defendant claims this testimony was improperly excluded and evidenced the court's bias. Defendant merely states, "The Court excluded this testimony, and predictably so." No basis for concluding there was judicial bias appears. Even if there was error, such error was harmless. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

k) *Manipulation of evidence*

Defendant contends the trial court exhibited bias by manipulating evidence of official files and reports. Defendant claims the trial court did so by making favorable rulings to the prosecution with respect to three rulings. These rulings related to the trial court allowing the prosecution to admit James Bernstein's criminal file and allowing the testimony of Los Angeles Police Detective Terry Richardson. Detective Richardson testified about his search on the police department's computer database with respect to Robert Samuels and his opinion that Robert Samuels was never arrested and never had a criminal complaint filed by the defendant against him. Defendant also believes the trial court improperly excluded exhibit F, which was a police report relating to Dean Groover.

Even if these evidentiary rulings were erroneous, such error was harmless. (*People v. Watson, supra*, 46 Cal.2d at p. 836.) In addition, the record is bereft of any indication the trial court was biased in its rulings. On the contrary, the record indicates the trial judge—as he did throughout the trial—went to great lengths to ensure that both parties were allowed to make their arguments before he made an evidentiary ruling. (*Kreling v. Superior Court, supra*, 25 Cal.2d at p. 312; *Scott v. Family Ministries, supra*, 65 Cal.App.3d at p. 510.)

l) *Admission of Elizabeth Kaufman's testimony*

Elizabeth Kaufman was Robert Samuels's divorce attorney. She testified that Samuels intended to seek a change in spousal support and permission to operate the Subway restaurant. At trial, testimony was elicited that on the day Samuels's body was discovered, defendant told the police that she had a good relationship with Samuels. In addition, defendant stated to a sheriff's deputy that she hoped that she and Samuels would get back together again. The prosecution also introduced testimony at trial that Samuels had a "less than cordial" relationship with defendant, had missed a support payment, and had fought with defendant over her continuing to work at the Subway restaurant. Under all these circumstances, the jury could reasonably infer defendant knew about, and was angered by, Robert Samuels's intention to finalize his divorce and reduce her financial support—thereby providing her a motive to have him killed. Accordingly, the challenged testimony was admissible because it was relevant to show Robert Samuels's state of mind concerning defendant. (*People v. Smithey* (1999) 20 Cal.4th 936, 971–972 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) There was no error, and necessarily no constitutional violation.

As set forth above, despite defendant's lengthy catalogue of alleged biases, we conclude the record does not support any display of bias by the trial court. (*Kreling v. Superior Court, supra,* 25 Cal.2d at p. 312; *Scott v. Family Ministries, supra,* 65 Cal.App.3d at p. 510.)

### 3. *Alleged Inadmissible Hearsay*

#### a) *Testimony of David Navarro, Rennie Goldberg, and Matthew Raue*

Defendant claims the trial court improperly admitted hearsay from three witnesses with respect to their conversations with James Bernstein. These witnesses were David Navarro, Rennie Goldberg, and Matthew Raue. Defendant claims this error denied her rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

#### (1) *David Navarro's testimony*

David Navarro testified that in discussing Robert Samuels's death, Bernstein said, "He had done it and Mike [Silva] had helped him. And that [defendant] had paid him." Navarro further testified that Bernstein said defendant had paid him, that Bernstein had skimmed money off the top for himself, and then paid the balance to Mike Silva. Bernstein also told Navarro that he paid Silva in cocaine "in lieu of the money."

■ Despite the People's contention that defendant has waived this issue, the record reflects that defendant preserved this issue for appellate review. (*People v. Scott* (1978) 21 Cal.3d 284, 290 [145 Cal.Rptr. 876, 578 P.2d 123] ["In a criminal case, the objection will be deemed preserved if, despite inadequate phrasing, the record shows that the court understood the issue presented"].)

■ Nevertheless, the claim fails on the merits. Bernstein's statement to Navarro was properly admitted as a statement against penal interest. Under that exception, an otherwise inadmissible hearsay statement may come into evidence if the statement, when made, subjected the declarant to serious risk of civil or criminal liability or to various other serious risks. (Evid. Code, § 1230.)

This case is distinguishable from *People v. Lawley* (2002) 27 Cal.4th 102, 151–154 [115 Cal.Rptr.2d 614, 38 P.3d 461], upon which defendant relies, for Bernstein's facially incriminating comments were in no way exculpatory, self-serving, or collateral. Defendant argues that Bernstein's assertion "that [defendant] had paid him" for the killing was either collateral to his statement against penal interest, or an attempt to shift blame. We disagree.

This admission, volunteered to an acquaintance, was specifically disserving to Bernstein's interests in that it intimated he had participated in a contract killing—a particularly heinous type of murder—and in a conspiracy to commit murder. Under the totality of the circumstances presented here, we do not regard the reference to defendant incorporated within this admission as itself constituting a collateral assertion that should have been purged from Navarro's recollection of Bernstein's precise comments to him. Instead, the reference was inextricably tied to and part of a specific statement against penal interest. (See *People v. Wilson* (1993) 17 Cal.App.4th 271, 277 [21 Cal.Rptr.2d 420].) Moreover, the differences between the trustworthiness of the statements involved in this case and those excluded in *People v. Lawley, supra,* 27 Cal.4th at pages 151–154 (in which we found no abuse of discretion in the trial court's exclusion, following an offer of proof, of proposed testimony recounting a prisoner's assertions that the Aryan Brotherhood was involved in a homicide he claimed to have committed) are palpable. In any event, even had the trial judge erred, any such error was harmless. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

### (2)  *Testimony of Rennie Goldberg and Matthew Raue*

Rennie Goldberg testified that in April 1989 Bernstein told him that he was being solicited by both defendant and her daughter Nicole to have Robert Samuels murdered and that he was considering doing so (even though Samuels had already been killed in December 1988). Matthew Raue testified that in the spring of 1989, Bernstein said he was approached by defendant and Nicole to help them murder Robert Samuels. Defendant moved to exclude the testimony of Raue and Goldberg on hearsay grounds. The prosecutor argued that the testimony was admissible as either an admission of a coconspirator or as a statement against Bernstein's interest. The trial court denied this motion, ruling that the coconspirator exception applied. Defendant claims the trial court erred by allowing this testimony.

With respect to Bernstein's statements made to Raue and Goldberg, defendant is correct that none of the statements could be admitted under the hearsay exception for statements made in furtherance of a conspiracy. Raue and Goldberg testified that their conversations with Bernstein took place after Robert Samuels had been murdered. Therefore, Bernstein's statements could not have been made in furtherance of any conspiracy.

Defendant also argues the statement against penal interest exception to the hearsay rule is not applicable to Goldberg and Raue's testimony. Even assuming the admission of these statements was error, any error was harmless. (*People v. Watson, supra,* 46 Cal.2d at p. 836.) In addition, assuming defendant's constitutional claim was properly preserved on appeal (see

*People v. Yeoman* (2003) 31 Cal.4th 93, 117, 133 [2 Cal.Rptr.3d 186, 72 P.3d 1166]), it fails on the merits. (*People v. Benavides, supra*, 35 Cal.4th at p. 91.)

### b) *Testimony of Detective George Daley*

Defendant claims that Detective Daley's testimony about Mike Silva was inadmissible and the trial court's error violated her Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution. We disagree.

During the prosecution's case-in-chief, Detective John Birrer testified that an anonymous caller had identified Mike Silva as the hit man used by James Bernstein to kill Robert Samuels. Detective Daley later testified that as a result of an anonymous call to Detective Birrer, Detective Daley located and interviewed Mike Silva.

Defendant argues that the trial court erred by allowing Detective Daley to testify about his conversation with Detective Birrer. Defendant contends that this testimony was hearsay and irrelevant. Because defendant failed to make a specific and timely objection on hearsay grounds, she failed to preserve this claim for review. (*People v. Waidla* (2000) 22 Cal.4th 690, 717 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

In any event, Detective Daley's testimony was not hearsay or irrelevant. It was not used to prove that Mike Silva killed Robert Samuels. Instead, the testimony was used to explain Detective Daley's reasons for obtaining search warrants and contacting Mike Silva—subsequent action by a law enforcement officer during his investigation into a murder. Accordingly, the trial court did not err.

Defendant also contends that Detective Daley's testimony should have been excluded because it exceeded the scope of his cross-examination. It did not. During Detective Daley's cross-examination defense counsel asked questions about Mike Silva, including whether Silva was ever arrested for Robert Samuels's murder. Therefore, Detective Daley's testimony on redirect examination did not exceed the scope of his cross-examination. (See *People v. Brown* (1991) 234 Cal.App.3d 918, 939 [285 Cal.Rptr. 824].)

Defendant also claims Detective Daley should not have been allowed to testify that Mike Silva was dead. The record indicates that Silva's death was relevant because defendant had placed it at issue. In fact, after acknowledging this fact during a discussion outside of the jury's presence, defendant requested the prosecutor not elicit details about how Silva's death occurred.

The trial court then directed the prosecutor not to elicit details on Silva's death. Thus, defendant is barred from challenging this testimony. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139 [124 Cal.Rptr.2d 373, 52 P.3d 572].) Finally, assuming defendant's constitutional claim was properly preserved on appeal (see *People v. Yeoman, supra,* 31 Cal.4th at pp. 117, 133), no constitutional or other error occurred.

### c) *Testimony of Elizabeth Kaufman and Susan Conroy*

As set forth above, Elizabeth Kaufman was Robert Samuels's divorce attorney. She testified that Samuels intended to seek a change in spousal support and court permission to operate the Subway restaurant. Susan Conroy was Samuels's sister. Conroy testified that Samuels told her that he intended to finalize his divorce from defendant. Defendant contends the trial court erred by admitting Samuels's statements to Kaufman and Conroy with respect to Samuels's intent to seek a change in spousal support and to finalize his divorce from defendant. Defendant claims these statements were inadmissible because they were hearsay, irrelevant, and violated her constitutional rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Defendant objected on hearsay grounds, but not on constitutional grounds.

For the reasons set forth in part B.2.*l* (*ante,* at pp. 119–120), the trial court properly admitted this testimony. In addition, assuming defendant's constitutional claim was properly preserved on appeal (see *People v. Yeoman, supra,* 31 Cal.4th at pp. 117, 133), no constitutional or other error occurred.

### 4. *Alleged Error in Admitting Photographs*

Defendant argues that the trial court erred by admitting certain photographs of Robert Samuels, thereby violating her constitutional rights under the Eighth and Fourteenth Amendments of the United States Constitution. Defendant argued at trial that the photographs were cumulative, offensive, and had no probative value.

"The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]" (*People v. Crittenden* (1994) 9 Cal.4th 83, 133–134 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

The autopsy photographs depicted Robert Samuels's body as it lay on a table in the county morgue. The photographs depict that Samuels was shot in

the back of the head by a shotgun and were relevant to illustrate and corroborate the testimony supplied by Dr. Christopher Rogers, Deputy Medical Examiner for Los Angeles County. Dr. Rogers testified for the prosecution with respect to Robert Samuels's autopsy and established the manner in which Samuels was killed and other relevant matters. (*People v. Crittenden, supra,* 9 Cal.4th at p. 132.)

■ Nor was the probative value of the autopsy photographs clearly outweighed by their prejudicial effect. "We have described the 'prejudice' referred to in Evidence Code section 352 as characterizing evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues. [Citation.] As we previously have observed, victim photographs and other graphic items of evidence in murder cases always are disturbing. [Citation.]" (*People v. Crittenden, supra,* 9 Cal.4th at p. 134.)

Our independent review of the photographs leads to the conclusion that, although the photographs are unpleasant, they are not unduly shocking or inflammatory. Accordingly, the trial court did not abuse its discretion in admitting the photographs.

■ To the extent defendant also argues that the photographs are cumulative, we reject her argument. (*People v. Crittenden, supra,* 9 Cal.4th at pp. 134–135 ["We often have rejected the contention that photographs of a murder victim must be excluded as cumulative simply because testimony also has been introduced to prove the facts that the photographs are intended to establish"].) In addition, assuming defendant's constitutional claim was properly preserved on appeal (see *People v. Yeoman, supra,* 31 Cal.4th at pp. 117, 133), it fails on the merits.

### 5. *Alleged Prosecutorial Misconduct in Questioning Witnesses*

Defendant contends the prosecutor committed misconduct by injecting inadmissible evidence at trial and then abandoning it after the jury was contaminated. She claims her rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the federal Constitution were violated. Defendant failed to object or seek a curative admonition, therefore this issue is waived on appeal. (*People v. Brown* (2004) 33 Cal.4th 382, 398–399 [15 Cal.Rptr.3d 624, 93 P.3d 244].) However, there is no error.

■ " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [40 Cal.Rptr.2d

456, 892 P.2d 1199].) " 'Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 427 [79 Cal.Rptr.2d 408, 966 P.2d 442].) Finally, "when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

Defendant cites several incidents at trial where the prosecutor allegedly committed misconduct.

### a) *Impeachment of Robert Birney*

Robert Birney, a defense investigator, testified on behalf of defendant. Birney testified that he had been a police officer for the City of Los Angeles for approximately 21 years. On cross-examination, the prosecutor asked Birney if he had ever been suspended from his duties with the Los Angeles Police Department. Defendant objected and the parties discussed the matter outside of the jury's presence. The prosecutor stated that a former colleague of Birney's had informed her that Birney had been suspended for improper conduct with respect to a suspect he once booked and his involvement with an underage female related to that suspect. This suspension allegedly occurred 10 or 11 years earlier.

Outside of the jury's presence, Birney testified that he recalled an incident similar to the one described by the prosecutor. However, Birney stated that he was not suspended and had not taken any voluntary days off because of this incident. The prosecutor stated that she would call the source as a witness to impeach Birney's testimony. The prosecutor then withdrew her question until other witnesses could be called or she could prepare a motion pursuant to *Pitchess v. Superior Court, supra,* 11 Cal.3d 531. On redirect examination, Birney testified that he had not been suspended.

Although defendant objected to the prosecutor's question about Birney's alleged suspension, defendant failed to request an admonition. (See *People v. Brown, supra,* 33 Cal.4th at pp. 398–399.) Nevertheless, there was no misconduct. Birney's admission that there was an incident that was investigated shows that there was some good faith basis for the prosecutor's asking whether he was suspended as a result of the investigation. In addition, the prosecution's withdrawal of the question combined with Birney's testimony stating that he was never suspended do not lead to a reasonable likelihood

that the jury construed or applied any of the complained-of remarks in an objectionable fashion. (*People v. Prieto* (2003) 30 Cal.4th 226, 260 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

b) *Cross-examination of Nicole Samuels and handwriting exemplars*

On cross-examination by the prosecution, Nicole Samuels admitted to signing some checks she gave to James Bernstein. Defendant claims that the prosecutor committed misconduct by preventing Nicole from providing a handwriting exemplar showing that certain sections of the checks were not in her handwriting. As a result of this alleged misconduct, defendant claims the prosecutor prevented Nicole Samuels from rehabilitating herself. We disagree.

The relevant factual context is recounted above. (See *ante*, at p. 114.) For the reasons stated in our rejection of defendant's claim of judicial bias, there is also no prosecutorial misconduct based on the prosecutor's relevance objection. Again, defendant was free to seek a handwriting sample from Nicole and have an expert testify as to any discrepancies between the exemplar and the check.

c) *Alleged preclusion of impeachment of Detective Daley*

For the reasons set forth in part B.2.b (*ante*, at pp. 114–115), we reject defendant's contention that the prosecutor committed misconduct by precluding defendant from impeaching Detective Daley.

d) *Alleged improper cross-examination of defense witness Annette Bunnin-Church*

Defendant claims the prosecution improperly cross-examined defense witness Annette Bunnin-Church by asking her questions about defendant's character for truth and veracity. Defendant failed to raise objections to the initial questions about her character and, even after defendant objected, she failed to request a timely admonition, which would have cured any prejudice from the alleged misconduct. Accordingly, she cannot raise this claim on appeal. (*People v. Prieto, supra*, 30 Cal.4th at pp. 259–260.)

On the merits, the record indicates the prosecutor did not introduce improper subject matter into Bunnin-Church's cross-examination. Bunnin-Church's testimony stating that she never had doubts about defendant's truthfulness does not lead to the conclusion that there is a reasonable likelihood the jury construed or applied any of the complained-of remarks in an objectionable fashion. (*People v. Prieto, supra*, 30 Cal.4th at p. 260.) There was no misconduct.

### 6. *Alleged Error in Failing to Grant Immunity to Wanda Piety*

Paul Gaul testified for the prosecution pursuant to a plea agreement. He recalled a conversation that took place on a sheriff's bus with defendant. Gaul testified defendant stated she understood that he was testifying against her because he was given no choice. Gaul also testified that defendant said, "You're the only one who can cut me loose. You already—I know you took your deal. You can cut me loose." Gaul testified that he told defendant that this was not the case and that he was simply telling the truth.

To impeach Gaul's testimony, defendant attempted to call Wanda Piety. Piety was also present on the bus during the conversation between Gaul and defendant and allegedly heard Gaul tell defendant that he knew she was innocent, but that he had to testify against her in order to get his plea agreement. However, when faced with the possibility of being cross-examined by the prosecution, Piety advised the court that she would assert her Fifth Amendment rights. The defense then moved the court to grant Piety immunity, which the court denied.

▮ Defendant claims the prosecutor committed misconduct by not granting Piety immunity, thereby subjecting Piety to possible cross-examination with respect to the facts of her own case. We have previously stated, "[A]lthough the prosecution has a statutory right, incident to its charging authority, to grant immunity and thereby compel testimony [citation], California cases have uniformly rejected claims that a criminal defendant has the same power to compel testimony by forcing the prosecution to grant immunity." (*In re Williams* (1994) 7 Cal.4th 572, 609 [29 Cal.Rptr.2d 64, 870 P.2d 1072].) Accordingly, the prosecutor did not commit misconduct.

Defendant also claims the trial court's failure to grant Piety immunity compounded the prosecutor's alleged misconduct and violated defendant's Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the federal Constitution.

"[O]ur court [has] characterized as 'doubtful' the 'proposition that the trial court [possesses] inherent authority to grant immunity.' [Citations.]" (*People v. Stewart* (2004) 33 Cal.4th 425, 468 [15 Cal.Rptr.3d 656, 93 P.3d 271].) However, we have stated that it is "possible to hypothesize cases" where "judicially conferred use immunity might possibly be necessary to vindicate a criminal defendant's rights to compulsory process and a fair trial." (*People v. Hunter* (1989) 49 Cal.3d 957, 974 [264 Cal.Rptr. 367, 782 P.2d 608].) To the extent we assume there is such a judicial authority, we hold that the trial court properly denied defendant's request. Piety's testimony would have been cumulative of testimony previously offered by other witnesses,

such as Susan Jasso, who testified that she heard the same conversation that Piety would have described. (*Stewart*, at p. 470.) In addition, in light of Jasso's testimony, Piety's testimony was not essential. (*Id.* at p. 469.)

### 7. Alleged Error with Respect to Polygraph Evidence

Defendant argues the prosecutor committed misconduct by improperly using evidence relating to polygraph examinations in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. The prosecution was allowed to present testimony with respect to defendant's lack of cooperation with the police during the investigation of Robert Samuels's death. However, the trial court refused to allow her to present evidence of her willingness to submit to, and her successful completion of, a polygraph test. Defendant argues such evidence would have contradicted the prosecution's claim that she was not cooperative during the investigation. This claim lacks merit since polygraph evidence, absent a stipulation by all parties, is not admissible. (Evid. Code, § 351.1; *People v. Wilkinson* (2004) 33 Cal.4th 821, 849–852 [16 Cal.Rptr.3d 420, 94 P.3d 551].)

Defendant also argues the prosecutor committed misconduct by eliciting testimony from Marsha Hutchinson that related to statements defendant made to her about how to "beat" a polygraph test. There was no misconduct. The trial court properly admitted this testimony on the basis that it demonstrated defendant's consciousness of guilt. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) Even if there was misconduct, the admission of such evidence could not be prejudicial under any standard given the ample evidence against defendant.

### 8. Alleged Prosecutorial Misconduct with Respect to Injecting Misleading Testimony

Defendant contends the prosecutor committed misconduct and violated certain of her constitutional rights by injecting the false and misleading testimony of Detective George Daley with respect to a conversation between defendant and James Bernstein. Daley's disputed testimony relates to discussions between defendant and Bernstein that Daley overheard and recorded at a police station. These statements involved someone named "Dave" who had approached defendant at a nightclub and agreed to kill Robert Samuels for money. In addition, Daley testified that the conversation between defendant and Bernstein was "cordial and suspicious."

As a general rule, to preserve a claim of prosecutorial misconduct, the defense must make a timely objection and request an admonition to cure

any harm. (*People v. Brown, supra*, 33 Cal.4th at pp. 398–399.) Defendant failed to object to the alleged prosecutorial misconduct or to request an admonition. Accordingly, defendant has failed to preserve this claim.

Nonetheless, defendant's claim also lacks merit. Defendant merely assumes Daley misremembered or misrepresented the conversation, and that this problem could have been avoided had the trial court admitted the conversation in recorded and transcribed form. As set forth (*post*, at pp. 129–130), the trial court properly excluded the tape and transcription of the conversation. In any event, such an assumption is speculative as it appears defense counsel's vigorous questioning of Daley failed to show that Daley's testimony was false or misleading.

### 9. *Improper Exclusion of Taped Conversation*

#### a) *Best evidence rule*

Defendant contends the trial court violated Evidence Code section 1521 by permitting Detective Daley to testify, during the prosecution's case, with respect to a recorded prearrest conversation between defendant and James Bernstein.[4] Defendant claims this error violated her constitutional rights under the Sixth and Fourteenth Amendments of the United States Constitution. On appeal, defendant claims the tape of the entire conversation should have been admitted under the secondary evidence rule, codified in Evidence Code section 1520 et seq. We disagree.

The secondary evidence rule was not effective until January 1, 1999. Since the instant trial commenced prior to January 1, 1999, the secondary evidence rule is not applicable. Accordingly, we apply the law that was applicable at the time, Evidence Code former section 1500 et seq.,[5] commonly referred to as the "best evidence rule." (See *In re Kirk* (1999) 74 Cal.App.4th 1066, 1073 [88 Cal.Rptr.2d 648].)

Applying the best evidence rule to this case, "[i]t is well settled that where both a tape recording of a conversation and a witness to the conversation are available at trial, the testimony of the witness is not barred by the best evidence rule. [Citations.]" (*People v. Patton* (1976) 63 Cal.App.3d 211, 220 [133 Cal.Rptr. 533].) We have stated, "The so-called best evidence rule is

---

[4] Detective Daley interviewed Bernstein at the police station on April 24, 1989. After this interview, Daley asked defendant to come to the police station. Daley placed defendant and Bernstein in the same room and listened to their conversation from a monitoring room in the police station.

[5] Evidence Code sections 1500 to 1511 were effective until January 1, 1999. (Stats. 1998, ch. 100, § 1.)

inapplicable under such circumstances. Since the officer was testifying to what he had seen and heard, his testimony was 'primary evidence' whether or not 'part of the same matter was incorporated into a sound recording.' [Citation.] In other words, he was not testifying as to what the recording contained but 'as to what he observed and knew because he heard it. . . . [His] testimony . . . is not rendered incompetent by the fact of the existence of the [recording].' [Citations.]" (*People v. Sweeney* (1960) 55 Cal.2d 27, 38 [9 Cal.Rptr. 793, 357 P.2d 1049].) Assuming defendant's constitutional claim was properly preserved on appeal (see *People v. Yeoman, supra,* 31 Cal.4th at pp. 117, 133), it fails on the merits.

b) *Rule of completeness*

Defendant further contends the trial court erred and violated her constitutional rights under the Sixth, Eighth, and Fourteenth Amendments of the federal Constitution by denying her motion to admit the entire tape recording and transcript of the conversation between defendant and James Bernstein under Evidence Code section 356. That section provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

The purpose of Evidence Code section 356 is to avoid creating a misleading impression. (*People v. Arias* (1996) 13 Cal.4th 92, 156 [51 Cal.Rptr.2d 770, 913 P.2d 980].) It applies only to statements that have some bearing upon, or connection with, the portion of the conversation originally introduced. (*People v. Zapien* (1993) 4 Cal.4th 929, 959 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Statements pertaining to other matters may be excluded. (*People v. Williams* (1975) 13 Cal.3d 559, 565 [119 Cal.Rptr. 210, 531 P.2d 778].)

At trial, defendant sought to introduce the entire tape of the conversation, which covered areas outside of Detective Daley's testimony. The prosecution objected on hearsay grounds, and the trial court sustained the prosecution's objection. In addition, the trial court stated the tape was too long and would confuse the jury. The trial court informed defendant that she was free to seek admission of those portions of the tape that were purportedly relevant. The record indicates defendant failed to do so. There was no error.

10. *Alleged Instructional Error*

a) *Definition of reasonable doubt*

Defendant contends that CALJIC No. 2.90, defining reasonable doubt, is a violation of her due process rights under the Fourteenth Amendment of the United States Constitution. We have rejected this argument in the past and find no persuasive reason to revisit the issue. (*People v. Seaton* (2001) 26 Cal.4th 598, 667–668 [110 Cal.Rptr.2d 441, 28 P.3d 175].)

b) *CALJIC No. 2.01*

Defendant argues that the trial court erred by instructing the jury with CALJIC No. 2.01, because it undermined the requirement of proof beyond a reasonable doubt. Defendant claims this error violated her constitutional rights under the Fifth, Sixth, and Fourteenth Amendments of the federal Constitution. Defendant claims the instruction directed jurors to accept an incriminating interpretation of the evidence if it appeared to be reasonable, thereby allowing a conviction based on an appearance of guilt.

Defendant acknowledges we have previously held that "these instructions properly direct the jury to accept an interpretation of the evidence favorable to the prosecution and unfavorable to the defense only if no other 'reasonable' interpretation can be drawn. Particularly when viewed in conjunction with other instructions correctly stating the prosecution's burden to prove defendant's guilt beyond a reasonable doubt, these circumstantial evidence instructions do not reduce or weaken the prosecution's constitutionally mandated burden of proof or amount to an improper mandatory presumption of guilt. [Citations.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 375 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) We see no reason to revisit the question and reject defendant's claim.

C. *Penalty Phase Issues*

1. *Removal of Juror Audrey W.*

Defendant claims the trial court erred by removing Juror Audrey W. during the penalty phase deliberations. Defendant argues this error violated her constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

Section 1089 provides in pertinent part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be

unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors." " 'We review for abuse of discretion the trial court's determination to discharge a juror and order an alternate to serve. [Citation.] If there is any substantial evidence supporting the trial court's ruling, we will uphold it. [Citation.] We also have stated, however, that a juror's inability to perform as a juror " 'must appear in the record as a demonstrable reality.' " [Citation.]' " (*People v. Cleveland* (2001) 25 Cal.4th 466, 474 [106 Cal.Rptr.2d 313, 21 P.3d 1225].) We have also stated a court may remove a juror "who becomes physically or emotionally unable to continue to serve as a juror due to illness or other circumstances." (*Ibid.*)

Substantial evidence supports the trial court's decision. Here, Audrey W. requested that she be removed from the jury. In a letter to the court, Audrey W. wrote, "I have come to realize that I have serious questions about my ability to vote for the death penalty should I become convinced of its appropriateness in this case. I have not been able to resolve this conflict to my own satisfaction."

When questioned by the parties and the trial judge about her situation, Audrey W. provided statements indicating she would not be able to perform her duty as a juror. For example, when asked by the prosecutor whether she was "at the point now where you believe that perhaps you would under no circumstances ever be able to impose the death penalty in a case where you thought it was appropriate," Audrey W. stated, "Well, that's where I am afraid that I might not have the courage to do that. I think I explained to you on the form and also when I was questioned, theoretically I do believe in the death penalty. I was concerned about whether I would be able to act on it. And when I actually found myself faced with an actual case and having to consider that, I just found that it was—I was just afraid that I wouldn't be able to do that." The prosecutor then followed up by asking, "Is that what you are finding now, that you are just not able to consider it?" Audrey W. answered, "I'm afraid that I couldn't act on it."

Audrey W. also could not separate her discomfort over the death penalty from the facts and circumstances of the case. She stated, "I can't separate them and that's—that is what is causing me the issue right now. It was not a problem before I was able to keep them separate but now I've got that so I can't get them separated out."

▮ In addition, when asked by the prosecutor whether her physical, emotional, or mental state was being impaired or would be impaired if she

continued to deliberate, she stated that she "was not in a good place to continue." The court determined that "there was enough there to raise some red flags in my concern."

Accordingly, the record reflects that Audrey W. was distressed and volunteered to the court that she could not follow her oath and instructions to consider imposition of the death penalty in this case. She also admitted she lacked "courage" to impose the ultimate punishment if appropriate under all the circumstances, and that she feared she "couldn't act" on her obligation to do so. Therefore, after a meaningful inquiry, the trial court credited Audrey W.'s expressions of her state of mind and determined there was a demonstrable reality that she was unable to perform as a juror. We defer to this finding and the underlying record. The trial court did not abuse its discretion by dismissing Audrey W. (*People v. Cleveland, supra,* 25 Cal.4th at p. 474.)

### 2. *Alleged Prosecutorial Misconduct*

#### a) *Closing argument*

Defendant claims the prosecutor committed misconduct by improperly referring to defendant's bad character, in violation of her constitutional rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. We disagree. "The claim was waived by [defendant's] failure to object to the statement at trial. [Citation.]" (*People v. Staten* (2000) 24 Cal.4th 434, 465 [101 Cal.Rptr.2d 213, 11 P.3d 968].) The claim also lacks merit. Defendant mischaracterizes the prosecutor's statements. The comments at issue were part of the prosecutor's argument that defendant had failed to show any remorse. We have "consistently rejected claims of prosecutorial misconduct based on a prosecutor's reference to the defendant's lack of remorse." (*People v. Lewis* (2001) 25 Cal.4th 610, 673 [106 Cal.Rptr.2d 629, 22 P.3d 392].)

#### b) *Biblical references*

Defendant also claims that, over her objections, the prosecutor committed misconduct by referring to the Bible.[6] Defendant claims that as a result of

---

[6] In referring to the Bible, the prosecutor stated: "Genesis chapter 9, verse 6; Exodus chapter 21, verse 12; and the Book of Numbers chapter 35, verse 31 all repeat the same basic message: 'Whoever sheds the blood of man, by man shall his blood be shed, for in his image did God make man.' . . . 'He who fatally strikes a man shall be put to death.' Exodus even answers a common defense argument that only God can take a life. 'It is not [*sic*] man, not God, who is to execute murderers. By man shall his, murderers blood be shed.' Although some look to the New Testament and quote, 'Vengeance is mine, I will repay saith the Lord,' in the very next chapter, Romans, Paul calls for capital punishment by saying, 'The ruler bears not the

this misconduct, her constitutional rights under the Sixth, Eighth and Fourteenth Amendments of the United States Constitution were violated.

We have previously stated, " '[t]he primary vice in referring to the Bible and other religious authority is that such argument may "diminish the jury's sense of responsibility for its verdict and . . . imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions." ' [Citations.]" (*People v. Hughes* (2002) 27 Cal.4th 287, 389 [116 Cal.Rptr.2d 401, 39 P.3d 432].)

Even if the prosecutor's argument was error, such error was harmless. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1211 [120 Cal.Rptr.2d 477, 47 P.3d 262].) The prosecutor's biblical argument was only a small part of her argument, the bulk of which focused on arguing to the jury why it should find that the statutory aggravating factors outweighed the mitigating factors.

    c) *Prosecutor's alleged statements suggesting ultimate responsibility for imposing the death penalty did not rest with the jury*

Defendant claims that the prosecutor committed misconduct by suggesting that the ultimate responsibility for imposing the death penalty did not rest with the jury. Defendant bases this argument on references the prosecutor made to defendant's appellate rights and the Governor's power of commutation, and argues that such references should have resulted in the trial court granting her motion for a mistrial.

The first statement defendant relies on was made when the prosecutor contrasted the imposition of the death penalty as so-called state-sanctioned murder with the killing of Robert Samuels. The prosecutor said, "It seems somewhat incredible that some people can't grasp the moral difference between the taking of an innocent life and the state enforcing laws and taking a life. [¶] The defendant has had all of the guarantees that our system of justice has entitled her to. She has had her preliminary hearing. She has had a fair trial. She has had a penalty phase. She will have appellate review. What rights did the victims have?" The other statement was made by the prosecutor in anticipation that defense counsel would argue "that there are others in California who have committed far more brutal crimes who didn't get the death penalty." The prosecutor stated, "Well the fact of the matter is in California the death penalty is the law of the land. That's not true in all states. Even in California there was a time when the death penalty was repealed and all those on death row had their sentences commuted. Now please don't misunderstand me, I'm not suggesting that that will happen in

---

sword—' . . . '—the sword in vain for he is the minister [of] God, a revenger to execute wrath upon him that doeth evil.' "

this case. You cannot consider that and that's not the reason I bring it up. The only reason I bring it up is to suggest to you that such analogies and such comparisons are not fair."

Here, there is no reasonable likelihood a juror would have understood the prosecutor as suggesting that the responsibility for imposing a death sentence rested elsewhere. (*Caldwell v. Mississippi* (1985) 472 U.S. 320, 328–329 [86 L.Ed.2d 231, 105 S.Ct. 2633].) There was no misconduct and there was no basis for the trial court to grant defendant's request for a mistrial.

3. *Alleged Instructional Error*

a) *Meaning of life imprisonment without the possibility of parole*

Defendant claims that the trial court erroneously instructed the jury on the meaning of life imprisonment without the possibility of parole in violation of her constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. We reject this claim.

Here, the trial court read to the jury CALJIC No. 8.84, which stated that defendant's punishment would be "death or confinement in the state prison for life without the possibility of parole . . . ." Our cases hold that CALJIC No. 8.84 adequately informs the jury of defendant's ineligibility for parole. (*People v. Prieto, supra,* 30 Cal.4th at pp. 269–271.)

Defendant seeks to distinguish *Prieto* on the ground that here the jury manifested some confusion as to the meaning of life imprisonment without the possibility of parole, as evidenced by its note to the judge asking, "Does 'without the possibility of parole' mean no chance of parole—ever!" After receiving this note, the trial court conferred with counsel and, over defendant's objection, decided to repeat its prior instructions. The trial court stated it would reiterate these instructions and "see what happens." The trial court stated, "If they ask a further question, they'll get a further answer."

Unlike the situation in *Prieto,* here the jury expressed confusion regarding CALJIC No. 8.84's meaning. However, we reject defendant's claim because the trial court's refusal to respond more fully to the jury's question did not constitute prejudicial error. In so holding, we follow *People v. Bonillas* (1989) 48 Cal.3d 757, 798 [257 Cal.Rptr. 895, 771 P.2d 844], and *People v. Silva* (1988) 45 Cal.3d 604, 641 [247 Cal.Rptr. 573, 754 P.2d 1070], in which we observed no prejudicial error in refusals to respond to comparable jury requests for clarification as to the possibility of defendant's release from prison. Here, as there, "[t]he [court's] response left the jury in the same

position as when the jury asked the question—i.e., uncertain of the answers. It is inconceivable that such uncertainty affected the jury's penalty verdict." (*Silva*, at p. 641.)

### b) *Use of special verdict forms*

Defendant was found guilty of count 1, the first degree murder of James Bernstein. The jury failed to reach a verdict on the special circumstance allegation that the murder was committed for financial gain under section 190.2, subdivision (a)(1). Defendant was also found guilty of the first degree murder of Robert Samuels as set forth in count 2. The jury found that defendant committed this murder for financial gain under section 190.2, subdivision (a)(1). In addition, the jury found "the allegation that the offenses charged in Counts I and II are a special circumstance within the meaning of Penal Code section 190.2(a)(3) [multiple murder] to be true."

Over defendant's objection, the jury was given separate verdict forms for counts 1 and 2. The verdict form relating to count 1 read: "We the jury in the above entitled action, having found the defendant, Mary Ellen Samuels, guilty of the crime of murder in the first degree and the special circumstance of multiple murder to be true as related to Count I of the information, hereby fix the penalty at: death." The verdict form for count 2 stated: "We the jury in the above entitled action, having found the defendant, Mary Ellen Samuels, guilty of the crime of murder in the first degree and the special circumstances of multiple murder and murder for financial gain to be true as related to Count II of the information, hereby fix the penalty at: death."

On appeal, defendant argues that the use of separate verdict forms misled the jury by stating that the jury had found—at the guilt phase—a special circumstance for multiple murder for count 1. Defendant also claims this error violated her constitutional rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Defendant's argument rests on a faulty factual premise. The jury found defendant guilty of multiple murder under section 190.2, subdivision (a)(3) based on the allegations set forth in counts 1 and 2. In addition, the trial court instructed the jury that it could consider the multiple-murder special circumstance only once. The jury was not misled and the trial court did not commit any error. In addition, assuming defendant's constitutional claim was properly preserved on appeal (see *People v. Yeoman, supra,* 31 Cal.4th at pp. 117, 133), it fails on the merits.

### c) *Alleged instructional error in the death selection process used to condemn defendant*

Defendant further claims section 190.3, factor (a), which allows the consideration of the circumstances of her crime in the penalty phase, has been

applied so arbitrarily and capriciously that its application in her case violated the state and federal Constitutions. We have rejected this claim in prior decisions, and defendant has failed to offer grounds for reconsidering those holdings. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1050–1053 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

Nor was the trial court required to delete any inapplicable factors from the penalty phase instructions (*People v. Taylor* (2001) 26 Cal.4th 1155, 1179–1180 [113 Cal.Rptr.2d 827, 34 P.3d 937]), designate aggravating and mitigating factors (*id.* at p. 1180), or submit written findings and reasons for its death verdict (*People v. Jenkins, supra*, 22 Cal.4th at p. 1053).

Defendant claims the trial court did not adequately define the meaning of the term "mitigating." Defendant contends that CALJIC No. 8.88 as read to the jury was reasonably likely to lead the jury to believe it was limited by the type of mitigating evidence it could consider. We have previously rejected this argument and do so again. (*People v. Taylor, supra*, 26 Cal.4th at pp. 1180–1181.)

In addition, defendant claims the trial court should have instructed the jury that if the factors in aggravation did not outweigh the factors in mitigation, then it should return a sentence of life imprisonment without the possibility of parole. We reject this claim. (*People v. Duncan* (1991) 53 Cal.3d 955, 978 [281 Cal.Rptr. 273, 810 P.2d 131].)

### d) *Alleged trial court error by failing to instruct jury on core adjudicative principles*

We also conclude there is no constitutional requirement that the jury be instructed concerning the burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances (other than other-crimes evidence), the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence, and no requirement that the jury achieve unanimity as to the aggravating circumstances. (*People v. Jenkins, supra*, 22 Cal.4th at pp. 1053–1054.) Recent United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], have not altered our conclusions regarding the burden of proof or jury unanimity. (See *People v. Prieto, supra*, 30 Cal.4th at pp. 263, 275.)

We also reject defendant's argument that the court's failure to instruct the jury on the presumption of life violated the state and federal Constitutions. (See, e.g., *People v. Hughes, supra*, 27 Cal.4th at p. 404.)

### 4. *Constitutional Claims*

We reject defendant's claim that the death penalty law is unconstitutional by failing to adequately narrow the class of death-eligible offenders. (*People v. Prieto*, *supra*, 30 Cal.4th at p. 276.) We also reject defendant's claim that the death penalty law is constitutionally deficient because the prosecution retains discretion whether to seek the death penalty. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1095 [119 Cal.Rptr.2d 859, 46 P.3d 335].)

In addition, "[i]ntercase proportionality review is not required." (*People v. Combs* (2004) 34 Cal.4th 821, 868 [22 Cal.Rptr.3d 61, 101 P.3d 1007].) We similarly reject defendant's claims that the state and federal Constitutions are violated by the alleged influence of political pressure on this court in determining capital appeals. There is no basis for this claim and we have previously rejected it. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1140–1141 [113 Cal.Rptr.2d 27, 33 P.3d 450].)

### 5. *Alleged Cumulative Error*

Defendant argues that the cumulative effect of the errors at her penalty trial requires reversal of her death sentence. We disagree. Any errors we have found are no more compelling when considered in combination. Their cumulative effect does not warrant reversal of the judgment.

### III. DISPOSITION

We affirm the judgment in its entirety.

George, C. J., Baxter, J., Chin, J., and Moreno, J., concurred.

**WERDEGAR, J.**—Having found no error requiring reversal, I concur in the majority's decision to affirm the judgment. I write separately, however, to suggest the time has come to modify our position concerning whether a jury in a capital case should be completely informed of the meaning of life imprisonment without the possibility of parole.

The trial court in this case delivered CALJIC No. 8.84, the standard jury instruction concerning the penalties applicable in a capital case. That instruction states in pertinent part: "It is the law of this state that the penalty for a defendant found guilty of murder of the first degree shall be *death or imprisonment in the state prison for life without possibility of parole* in any case in which the special circumstance[s] alleged in this case [has] [have] been specially found to be true." (Italics added.) We have, in prior cases,

rejected the contention that the term "life without possibility of parole," as used in this instruction, "confuses jurors or has a technical meaning that requires a sua sponte definitional instruction." (*People v. Smithey* (1999) 20 Cal.4th 936, 1009 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; see, e.g., *People v. Prieto* (2003) 30 Cal.4th 226, 270–271 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Ochoa* (1998) 19 Cal.4th 353, 457 [79 Cal.Rptr.2d 408, 966 P.2d 442]; *People v. Sanders* (1995) 11 Cal.4th 475, 561–562 [46 Cal.Rptr.2d 751, 905 P.2d 420].) Our position on this issue has been clear and consistent.

Jurors, however, faced with making the enormous decision whether or not to impose society's ultimate criminal penalty, apparently are not so confident about the plain meaning of CALJIC No. 8.84. For example, in *People v. Snow* (2003) 30 Cal.4th 43 [132 Cal.Rptr.2d 271, 65 P.3d 749], the jury, after retiring to deliberate, sent out a note asking the trial judge: " 'If we give life imprisonment without possibility of parole, can we be assured he will never be[] released from prison[?]' " (*Id.* at p. 123.) Similarly, in *People v. Hart* (1999) 20 Cal.4th 546 [85 Cal.Rptr.2d 132, 976 P.2d 683], the jury, prior to closing argument, sent the trial court a note asking: " 'Does life in prison without the possibility of parole mean he will never get out under any circumstances?' " (*Id.* at p. 654.) In *People v. Bonillas* (1989) 48 Cal.3d 757 [257 Cal.Rptr. 895, 771 P.2d 844], the jury, after retiring to deliberate, sent out a note asking: " 'Is there any way at all that a parole could be granted[?] Please list the ways.' " (*Id.* at p. 797.) In *People v. Silva* (1988) 45 Cal.3d 604 [247 Cal.Rptr. 573, 754 P.2d 1070], the jury asked this question: " '[D]oes life in prison without possibility of parole mean just that, or is parole possible at some future date? If so, under what circumstances?' " (*Id.* at p. 640.) The instant case is no different; here, the jury sent out a note during deliberations that asked: "Does 'without the possibility of parole' mean no chance of parole—ever![?]"

Defense attorneys, aware of this potential confusion, often propose a special instruction in an attempt to clarify the meaning of a sentence of life imprisonment without the possibility of parole. For example, in *People v. Gutierrez* (2002) 28 Cal.4th 1083 [124 Cal.Rptr.2d 373, 52 P.3d 572], the defendant proposed an instruction that would have informed the jury that "life without the possibility of parole means 'defendant will be imprisoned for the rest of his life.' " (*Id.* at p. 1159.) In *People v. Thompson* (1988) 45 Cal.3d 86 [246 Cal.Rptr. 245, 753 P.2d 37], the defendant proposed this instruction: " '[I]f you determine that life without the possibility of parole is the proper sentence, you are instructed that the defendant will never be released from prison.' " (*Id.* at p. 129.) In the instant case, defendant proposed this penalty phase instruction: "You are instructed that life without possibility of parole means exactly what it says: The defendant will be

imprisoned for the rest of her life. [¶] . . . [¶] For you to conclude otherwise would be to rely on conjecture and speculation and would be a violation of your oath as trial jurors."

We generally affirm a trial court's rejection of such proposed instructions on the ground the instruction is technically incorrect (see *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1271 [74 Cal.Rptr.2d 212, 954 P.2d 475]) because a defendant, sentenced by a jury to life imprisonment without the possibility of parole, could still gain his freedom if a state or federal appellate court grants relief on appeal, or if the Governor exercises his commutation or clemency power (*People v. Thompson, supra,* 45 Cal.3d at p. 130). Although rare, these possibilities nevertheless exist.

Because the jury in this case specifically asked the trial court for guidance on the question of the possibility of parole, we know it was concerned about this issue. Given that the jury had already been instructed and had retired to deliberate, its question came at a critical point in the trial. Under the circumstances, the trial court should have answered the question. Penal Code section 1138 provides: "After the jury have retired for deliberation, . . . *if they desire to be informed on any point of law arising in the case*, they must require the officer to conduct them into court. Upon being brought into court, *the information required must be given* in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." (Italics added.)

Some jurors may have been concerned that the primary actor in a conspiracy that resulted in two murders could eventually go free were they to vote for life imprisonment instead of death. By simply rereading CALJIC No. 8.84—the same instruction already provided to the jury—the trial court failed to clarify the legal issue that concerned the jury and thus ran the risk that some jurors, erroneously believing release on parole was a possibility, voted to impose the death penalty as a way of ensuring defendant would never be released to kill again. A death penalty verdict reached under such circumstances may implicate a defendant's right to due process of law. (See *Simmons v. South Carolina* (1994) 512 U.S. 154, 162 [129 L.Ed.2d 133, 114 S.Ct. 2187] (plur. opn.) [due process violated when state imposes death sentence based in part on the defendant's future dangerousness when jury not informed the alternative penalty of life imprisonment was without parole].)

Providing the jury with a more complete picture of the legal effect of a sentence of life without the possibility of parole, admittedly, may encourage it to speculate on matters irrelevant to its penalty decision. We faced a similar situation in *People v. Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430], concerning whether a trial judge in a capital trial should inform the jury of the Governor's commutation power. We concluded: "When the jury raises the commutation issue itself—either during voir dire or in a question

posed to the court during deliberations—the matter obviously cannot be avoided and is probably best handled by a short statement indicating that the Governor's commutation power applies to both sentences but emphasizing that it would be a violation of the juror's duty to consider the possibility of such commutation in determining the appropriate sentence." (*Id.* at p. 159, fn. 12.)

We should apply the same approach to a jury's question concerning the meaning of life imprisonment without the possibility of parole. Thus, although CALJIC No. 8.84 seems clear on its face, some jurors may nevertheless believe a life prisoner will still be able to obtain release on parole sometime in the future. If the jury submits a question on this topic, I believe the trial court should respond with a short statement explaining that, in unusual cases, future action by the judiciary or the Governor may permit the defendant to obtain parole, that such possibilities apply whether the jury imposes a sentence of death or of life without the possibility of parole, that the jury should assume such future actors will follow the law, and that the jury should not speculate on such possibilities and should assume the sentence it reaches will be carried out.[1] (See *People v. Thompson*, *supra*, 45 Cal.3d at p. 131; see generally *People v. Davis* (1995) 10 Cal.4th 463, 547 [41 Cal.Rptr.2d 826, 896 P.2d 119] [quoting extensive instructions concerning the import of a sentence of death or of life without the possibility of parole and the factors the jury cannot properly consider].) In that way, the jury is fully informed as to its sentencing choices but is instructed not to consider matters irrelevant to its decision. A contrary conclusion, in which we tolerate a jury reaching a penalty decision while uncertain of the true meaning of the applicable penalty choices, seems unwise.

In the present case, the trial court indicated that if the jury were again to question the meaning of "life without possibility of parole" it would provide "a further answer." No further question was asked. Because nothing in the record suggests the trial court's failure to clarify the law in response to the jury's question convinced a juror to vote for death instead of life imprisonment, I cannot now conclude the trial court's failure to clarify CALJIC No. 8.84 was prejudicial. Accordingly, I concur.

Kennard, J., concurred.

---

[1] Of course, care should be taken not to suggest that the jury's responsibility for its verdict is in any way diluted by the possibility of an appeal or future commutation or grant of executive clemency. (See *People v. Memro* (1995) 11 Cal.4th 786, 878–879 [47 Cal.Rptr.2d 219, 905 P.2d 1305]; *People v. Fierro* (1991) 1 Cal.4th 173, 245 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; see generally *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633].) When a jury asks for greater elucidation on this subject, however, some mention of the possibility of appellate review or commutation may be unavoidable.

**KENNARD, J.,** Concurring and Dissenting.—I join the majority in affirming the judgment. I write separately to express my disagreement with the majority's analysis of two issues, one pertaining to financial motive to kill, the other involving the prosecutor's biblical references.

## I

At the guilt phase of defendant Mary Ellen Samuels's capital trial for the murders of her estranged husband and an accomplice who, she feared, would report the killing of her husband to the police, the prosecution presented this evidence: As a beneficiary of her husband's life insurance policy defendant received more than $240,000 in proceeds; she got $70,000 for selling a sandwich shop that she and her husband had owned; and she obtained $160,000 by refinancing the family home. She then spent the money on such things as an expensive sports car, a large television, limousine service, property in a Mexican resort, and clothing from a store called Trashy Lingerie.

Defendant challenges the trial court's admission into evidence of how she spent the money, contending it was inadmissible character evidence. The majority brushes the contention aside with this cursory comment: "[T]here was no error. The evidence was relevant to prove defendant's financial motive for killing Samuels. (*People v. Sapp* (2003) 31 Cal.4th 240, 313 [2 Cal.Rptr.3d 554, 73 P.3d 433].)" (Maj. opn., *ante,* at p. 112.) The majority's citation of *Sapp* is puzzling; no issue in that case bears the faintest resemblance to the merry widow's spending spree at issue here.

In *Sapp,* a jury convicted the defendant of murdering three people. Thereafter, in closing argument at the penalty phase, the prosecutor referred to evidence at the penalty phase that the defendant had also killed his mother (a crime for which he was not convicted), and argued that like the other murders, the defendant had a financial motive to kill his mother, because he owed her $60,000. On appeal, the defendant in *Sapp* contended that the trial court should have instructed the jury that in determining whether he had killed his mother (a prerequisite for using that fact against him as an aggravating circumstance at the penalty phase), the jurors should not infer, based on his commission of the charged murders, that he had a propensity toward criminal behavior. This court held that the evidence did not warrant such an instruction. (*People v. Sapp, supra,* 31 Cal.4th at pp. 312–313.)

*Sapp* is inapposite. (1) At issue there was the trial court's failure to give a particular jury instruction; at issue here is the admissibility of evidence.

(2) *Sapp* involved the penalty phase of a capital trial; this case involves the guilt phase. (3) In *Sapp*, the prosecutor tried to use evidence of three murders to prove the commission of a fourth murder; here, the prosecutor used evidence of defendant's spending spree after her husband's death to prove that she killed him.

The only aspect of *Sapp* that remotely resembles this case is the prosecutor's reference in *Sapp* to evidence that the defendant had a "financial motive" (*People v. Sapp, supra*, 31 Cal.4th at p. 312) to kill his mother because he owed her money. But that evidence is wholly unlike the evidence of financial motive at issue here, which pertains to how defendant spent the inherited money; in any event, this court's opinion in *Sapp* did not address the admissibility of that evidence. Thus, *Sapp* has no bearing on the issue here: Whether, as the majority holds, the manner in which defendant spent the money she inherited from the murder victim shows that she had a financial motive to kill him. The issue ought to be resolved by applying established principles on the admissibility of evidence.

Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts . . . ." (*People v. Garceau* (1993) 6 Cal.4th 140, 177 [24 Cal.Rptr.2d 664, 862 P.2d 664].) Motive is a material fact. (*Ibid.*)

Evidence that a defendant charged with murder inherited property or collected life insurance benefits from the victim is relevant, and therefore admissible, when the defendant knew of the policy's existence at the time of the victim's death. (*People v. Goedecke* (1967) 65 Cal.2d 850, 860 [56 Cal.Rptr. 625, 423 P.2d 777].) Such evidence would tend to show that the defendant had a motive for the murder. Thus, here the prosecution was entitled to introduce evidence that defendant collected life insurance benefits and inherited property on the death of her estranged husband, because it is reasonable to infer that she knew she would be entitled to them when her husband died. *But what she did with those assets* has no bearing on her motive to kill. How one disposes of inherited money or property differs from person to person. Some may choose to invest in the stock market or to support a favorite charity. Others may decide to use the inherited wealth to indulge in a buying spree largely for their own benefit and enjoyment, as occurred here. In either situation, *how* the inheritance is spent has no "tendency in reason" (Evid. Code, § 210) to establish a motive for the killing by which the funds were obtained.

Thus, the evidence of defendant's spending habits after her husband's death served only to show, as defendant puts it, that she was outside "the norm of middle class women," and that she was "a person of poor judgment" who was "loose with money." Assuming, as does the majority, that defendant objected with sufficient specificity to preserve the issue, the trial court erred by admitting, at the guilt phase of defendant's capital trial, evidence of how she spent the money she inherited from her murdered husband.

The error, however, was harmless, because there was overwhelming evidence of defendant's guilt. Three witnesses (Heidi Dougall, Celina Krall, and Marsha Hutchison) testified that defendant told them that she wanted her husband dead, and another witness (David Navarro) testified that defendant had solicited him to kill her husband. Defendant's close friend, Anne Hambly, testified that defendant told her she had persuaded James Bernstein to hire a "hit man" to kill defendant's husband. Defendant also told Hambly that she later had Bernstein killed because she was afraid that he would tell the police of her involvement in her husband's death. Paul Gaul, who killed Bernstein with the assistance of an accomplice, testified that defendant had asked him to commit the murder because Bernstein was blackmailing her by threatening to tell the police of her role in her husband's murder. Given the strength of this evidence, it is not "reasonably probable" (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]) that the outcome of defendant's trial would have been different if the trial court had excluded the evidence of how she spent the money she inherited after his death.[1]

I now turn to the prosecutor's biblical references at the penalty phase.

## II

In her closing argument to the jury, the prosecutor said: "Genesis chapter 9, verse 6; Exodus chapter 21, verse 12; and the Book of Numbers chapter 35, verse 31 all repeat the same basic message: 'Whoever sheds the blood of man, by man shall his blood be shed, for in his image did God make man.' " Defendant raised an objection, which the trial court overruled. The prosecutor then continued, " 'He who fatally strikes a man shall be put to death.' [¶]

[1] Defendant also argues that in addition to violating state law, admission of the evidence showing how she spent her inheritance violated her right to due process under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. She cites authority holding that the "admission of bad act testimony violate[s] due process" where " 'the admission of the testimony was arbitrary or fundamentally unfair.' " (*Terrovona v. Kincheloe* (9th Cir. 1988) 852 F.2d 424, 428, 429.) Assuming for the sake of argument that this standard, which pertains to the admission of prior *criminal* conduct by the defendant, is applicable here, I perceive no violation of defendant's constitutional rights. The trial court's admission of the evidence in question, although erroneous under state law, was not so damaging as to make the trial fundamentally unfair.

Exodus even answers a common defense argument that only God can take a life. [¶] 'It is not [*sic*] man, not God, who is to execute murders. By man shall his, the murderers [*sic*] blood be shed.' [¶] Although some look to the New Testament and quote, 'Vengeance is mine, I will repay saith the Lord,' in the very next chapter, Romans, Paul calls for capital punishment by saying, 'The ruler bears not the sword . . . in vain for he is the minister [of] God, a revenger to execute wrath upon him that doeth evil.' "

The prosecutor followed those biblical quotations with these comments: "Now that's enough said. And please understand I'm not telling you to use the Bible. *I'm telling you not to use the Bible. The Bible is not the law of the land.* [¶] *I only read those brief quotes for any of you who may have personal reservations against the death penalty because you believe that it is against your own beliefs.* [¶] *Please don't misunderstand because there was no other reason for reading those sections other than that.* [¶] Ladies and gentlemen, . . . a free society requires of its citizen jurors strength and vigilance and courage and resolve in making the tough decision that is before you now. [¶] It is much easier to beg you to spare a life than to ask you to take a life. That's because those of us who live within the norms of society have a natural compassion, a natural reference [*sic*] for life. [¶] It would be very easy for you to . . . walk away, to say that [defendant] will spend the rest of her life in prison. [¶] But there is a greater principle here. If you believe that the death penalty is appropriate, then to walk away and to take the easy road because it was convenient or because it's easy to live with, I submit you are ignoring the laws of the land that capital punishment should be applied when you decide it is appropriate." (Italics added.)

Defendant argues that the prosecutor's biblical references violated her rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. The majority does not resolve the issue. It simply concludes that even if improper, the prosecutor's argument did not prejudice defendant. The majority explains: "The prosecutor's biblical argument was only a small part of her argument, the bulk of which focused on arguing to the jury why it should find that the statutory aggravating factors outweighed the mitigating factors." (Maj. opn., *ante*, at p. 134.)

*If* I were to find that the prosecutor's biblical references in this case were improper, I would conclude that they prejudiced defendant. The majority is wrong when it says that a prosecutor's improper reliance on religious authority is harmless if it is only a "small part" of the prosecutor's closing argument. I explained why in my dissenting opinion in *People v. Slaughter* (2002) 27 Cal.4th 1187 [120 Cal.Rptr.2d 477, 47 P.3d 262]. There, this court used reasoning identical to that used by the majority here to find that the prosecutor's improper biblical references in his closing argument at the

penalty phase of a capital case were harmless. I dissented, with these comments: "The majority's assertion that the prosecutor's improper argument must be considered harmless because it was 'part of a longer argument that properly focused upon the factors in aggravation and mitigation' . . . makes little sense. Under that logic, prosecutors may freely refer to biblical authority when making their penalty arguments to juries in capital cases, secure in the knowledge that this court will never reverse a resulting death judgment for this misconduct, provided only that the prosecutors also present an argument focusing on the statutory aggravating and mitigating factors. Appeals to divine authority in jury arguments in capital cases are prejudicial when jurors for whom the aggravating and mitigating factors appear closely balanced use religious considerations to resolve their doubts, as the prosecutor's improper argument invites them to do." (*Id.* at p. 1228 (dis. opn. of Kennard, J.); see also *People v. Vieira* (2005) 35 Cal.4th 264, 309 [25 Cal.Rptr.3d 337, 106 P.2d 990] (dis. opn. of Kennard, J.).) The majority here employs the same faulty logic used by the majority in *Slaughter*.

Because, in my view, an impermissible reliance on religious authority by the prosecutor may be prejudicial even when, as here, the biblical references are only a short part of the prosecutor's argument, I must decide whether the prosecutor's biblical references in this case *were* improper. On point here is this court's decision in *People v. Hughes* (2002) 27 Cal.4th 287 [116 Cal.Rptr.2d 401, 39 P.3d 432], in which I joined. There the prosecutor, as in this case, quoted several biblical passages supportive of the death penalty in his closing argument at the penalty phase of a capital trial. But he went on to explain to the jury that he was not trying to argue that the Bible provided a basis for imposing the death penalty, but only to show that the Bible was " 'not an impediment to imposing the death penalty.' " (*Id.* at p. 391.) This court held the comments were permissible: "The prosecutor's references were part of a straightforward argument that jurors should not be persuaded either way by biblical and religious teachings, and that the ultimate penalty decision was an individual determination. The prosecutor did not imply or suggest that another, higher law should be applied instead of the court's instructions . . . ." (*Id.* at p. 392.)

"Because any use of biblical references in argument must be carefully scrutinized, cautious prosecutors will choose to avoid such references" (*People v. Harrison* (2005) 35 Cal.4th 208, 248 [25 Cal.Rptr.3d 224, 106 P.3d 895]); "[a] prosecutor who mentions the Bible in closing argument runs a grave risk that a reviewing court will . . . reverse the defendant's conviction" (*ibid.*).

But here, as in *Hughes,* the prosecutor's biblical references "were part of a straightforward argument that jurors should not be persuaded either way by biblical and religious teachings . . . ." (*People v. Hughes, supra,* 27 Cal.4th at p. 392), but should instead base their penalty decision on "the laws of the land." Thus, under this court's decision in *Hughes,* the prosecutor's argument did not violate defendant's constitutional rights.

Appellant's petition for a rehearing was denied September 21, 2005, and the opinion was modified to read as printed above. George, C. J., did not participate therein.