Filed 6/18/21  P. v. Mendiblez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C089079, C090818 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF-18-0825) |
| v. | |
| THEODORO BUSTAMANTE MENDIBLEZ, | |
| Defendant and Appellant. | |

A jury found defendant Theodoro Bustamante Mendiblez guilty of driving under the influence of alcohol, causing injury, and driving with a blood-alcohol level of 0.08 percent or above, causing injury, after he crashed his car and caused a collision that injured the victim.  After a restitution hearing, the trial court ordered defendant to pay $558,160.80 in victim restitution.

1

On appeal, defendant argues the trial court violated the Constitution and Evidence Code section 356,[1] the rule of completeness, when it admitted only some of the statements that he made to an investigating California Highway Patrol officer at the scene of the accident. He further asserts that the trial court incorrectly calculated the amount of restitution owed for the victim's lost future wages.[2] We will reverse the restitution order and otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Defendant was driving on a highway when he veered off the road and flipped his car. The vehicle came to rest on its side, blocking the westbound lane of the highway. The victim and his wife came upon the crash shortly thereafter and stopped to help defendant. The victim approached the car while his wife, who was driving, called 911. While the victim was on the highway next to defendant's car, a second car crashed into defendant's car, which, in turn, struck the victim and threw him into the air. The victim's hip and leg were injured, and he spent approximately six weeks in the hospital recovering from his injuries. Defendant's blood-alcohol content was later measured at 0.161 percent.

The prosecution charged defendant with one count of driving under the influence of alcohol, causing injury, and one count of driving with a blood-alcohol level of 0.08 percent or above, causing injury. (Veh. Code, § 23153, subds. (a), (b).) The prosecution also alleged, as to both counts, that defendant had been convicted of driving with a blood-alcohol level of 0.08 percent within 10 years and had a blood-alcohol level of 0.15 percent or more. (Veh. Code, §§ 23152, subd. (b), 23578.)

---

[1]    Undesignated statutory references are to the Evidence Code.

[2]    On defendant's motion, we consolidated the appeals from the convictions and restitution order.

2

A.     *Trial Testimony*

At trial, Nicholas Helfrich, a California Highway Patrol officer who interviewed defendant at the scene of the crime, testified for the prosecution. On direct examination, Helfrich testified that he was dispatched to investigate a traffic accident near Cache Creek Casino. He first conducted a collision investigation, and when that was complete, he started a separate driving under the influence (DUI) investigation.

The prosecutor did not ask Helfrich about the collision investigation. For the DUI investigation, Helfrich testified that he utilized a small card with a list of standard questions he asks anyone suspected of driving under the influence. The list included questions about defendant's physical state, such as whether he was sick, injured, diabetic, or epileptic, when he had last eaten or slept, and whether defendant had been drinking, as well as basic questions about his mental state, such as where he was and where he was headed at the time of the accident. Helfrich asked defendant each of these questions and defendant responded, among other things, that he had been driving his car and drank beer between 7:00 p.m. and 11:30 p.m., but did not know how many drinks he had.[3] Helfrich explained that he always asked the questions in the same order, and that the questions were intended to elicit background information for a field sobriety test. After asking the questions, he conducted various field sobriety tests on defendant. He then arrested defendant.

After Helfrich's testimony on direct examination about his DUI investigation, the trial judge excused the jury and convened a section 402 hearing in order to inquire about the order and nature of the two investigations conducted by Helfrich.

Officer Helfrich explained that he investigated the collision first because that is the way he was trained. He conducted the collision investigation and took a statement from

---

[3]     The interview occurred around 3:00 or 3:15 a.m.

3

defendant about it near defendant's car. He then asked defendant some prefield sobriety test questions near defendant's car, but took defendant about 150 feet away to a patrol car to conduct the actual field sobriety test.[4] He distinguished the DUI investigation from the earlier collision investigation, saying they were separate investigations that received separate case numbers and generated separate reports. Helfrich testified that he "take[s] care to keep them as separate investigations" pursuant to CHP policy.

During the section 402 hearing, defense counsel asked for permission on cross-examination, under section 356, to introduce a statement defendant made during the collision investigation "about how the collision happened" in order to create a complete record of what was said by defendant during Officer Helfrich's investigation. The prosecutor objected to the request, arguing that the DUI investigation involved a formulaic checklist and responses that stood alone from the responses given during the collision investigation. The court denied defendant's request, saying, "In this particular case the—there is nothing—first of all, there is nothing in the interview, the checklist interview of, do you have an injury, did you have a drink, how much did you drink, that needs completion, that was left out. [¶] If something was left out of the interview checklist, you could certainly bring it in, but it wasn't. This is a totally separate investigation done at a different time and different location with different reports, and I don't see any possibility of getting it in under 356.

"Again, your client can testify, if he wishes to get that statement in, but not in this fashion. [¶] So, my ruling is you may not cross-examine this witness about the subsequent statement about, or the other statement about the, he saw a deer and swerved."

---

**4**    Helfrich acknowledged that the collision investigation involved listing a primary cause for the collision, which, in the case of a DUI, would require the conclusion of the DUI investigation as well.

The jury ultimately found defendant guilty of both counts and found true the excess blood-alcohol enhancement allegations. The trial court found true the prior driving under the influence allegations. The trial court imposed a four-year term of probation with 360 days in county jail. The court reserved jurisdiction to issue a restitution order.

B.     *Restitution*

The victim and his wife testified at the restitution hearing. The two owned a restaurant together where defendant was the cook. Before the accident, the victim worked eight to twelve hours a day, seven days a week, although he sometimes worked up to sixteen hours per day. After he was injured, he was unable to work for over a year. When he returned to work, he was only able to work two or three hours a day because of his injuries. He did not think he would ever be able to work full time again.

As co-owners, the victim and his wife paid themselves equal shares of the net income from the restaurant. The victim testified his daily take home pay fluctuated between $200 and $400, using an hourly rate of $25 per hour. Taking those fluctuations into account, the victim earned on average $6,000 per month. After the accident, the income the victim and his wife brought home dropped by a "couple thousand" to less than $10,000 per month.[5]

Before the accident, the gross yearly income for the restaurant was approximately $300,000 or $320,000. The average monthly expenses were approximately $15,000. After the accident, when defendant was not working, the gross monthly income ranged between $20,000 and $26,000, which was "slightly less" than it had been before. More recently, the gross monthly income had still been less than before the accident and ranged

---

[5]     The testimony does not specify whether the "couple thousand" dollar loss was per month or per year, but the parties interpreted the statement to mean the victim and his wife together had a net income of $10,000 or less per month.

between $20,000 and $28,000.  The victim's wife explained that after the victim was injured, business expenses increased because they hired a new employee to cover the lost labor.

Both parties submitted briefing after the hearing.  The prosecution divided the restitution for lost wages into three separate time periods:  (1) the period after the accident but before the victim returned to work; (2) the short period after the victim returned to work but before the restitution proceedings; and (3) the period stretching four years into the future.[6]  To calculate the amount owed for the period after the accident but before the victim returned to work, the prosecution took the victim's statement that he earned $6,000 per month and multiplied it by the number of months in the period.

To calculate the amount owed for the period after the victim returned to work, but before the restitution proceedings, the prosecution began with the statement that the victim and his wife earned $10,000 per month after the accident.  That number was then divided in half to reflect only the victim's earnings, or $5,000 per month.  Then, to account for the two or three hours per day the victim was working, the prosecution subtracted $1,764 per month, for a total of $3,236 per month.[7]  The $3,236 figure was then multiplied by the number of months in the period.

To calculate the victim's future lost income, the prosecution asserted the victim would have been "paid about $150,000 per year from his business."  Then, the prosecution calculated the amount the victim could earn by working three hours per day, using the same figure used for the previous period ($3,236 per month) multiplied by 12

---

[6]     The prosecution also requested restitution in a variety of other categories, such as medical expenses.  Only the future lost income category is at issue on appeal.

[7]     The $1,764-per-month figure was calculated by dividing $5,000 per month by 30 days to determine daily pay ($167), dividing the daily pay by eight to determine the hourly rate ($21), and then multiplying the hourly rate by the number of hours worked in a month (84 hours, assuming three-hour work days, seven days a week, for four weeks).

months ($38,832 per year). The $38,832 was then subtracted from $150,000, to arrive at a figure of $111,168 per year. Finally, the $111,168 number was multiplied by the number of years for which future restitution was sought (four), for a total of $444,672.

The trial court awarded $558,160.80 in victim restitution, including the full amount sought for future lost income, saying, "The major disagreement that I have with the People's restitution demand relates only to the medical bills. [¶] I have essentially awarded the People the claim in all respects except for the medical bills. Normally, I would award medical bills, but in this particular case, Kaiser wrote them off as a charity case. [¶] . . . [¶] [The victim has] worked in his own business as an owner and as a chef and he really can't stand for very long. Chefs have to stand. Not too many chefs cook sitting down. So he is severely impacted by the injuries, so I find restitution to be fair. That is my order."

## DISCUSSION

### I

### *Exclusion of Defendant's Statement*

Defendant argues he should have been allowed to question Officer Helfrich about the statement defendant made during the collision investigation because the collision investigation and the DUI investigation were not, in fact, separate investigations. Had jurors heard his statement that he swerved to miss a deer and rolled his car, defendant argues, they would not have concluded defendant's intoxication caused the crash. We disagree.

Section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

7

The purpose of section 356 "is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed. [Citation.] Thus, if a party's oral admissions have been introduced in evidence, he [or she] may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission . . . in evidence.' " (*People v. Arias* (1996) 13 Cal.4th 92, 156.) "Statements pertaining to other matters may be excluded. [Citation.]" (*People v. Samuels* (2005) 36 Cal.4th 96, 130.) We review the trial court's determination of whether to admit evidence under this provision for abuse of discretion. (See *People v. Pride* (1992) 3 Cal.4th 195, 235.)

Here, the statement defendant made during the collision investigation was not on the "same subject" as his statements during the DUI investigation, and was not part of the same conversation, since the collision investigation was separated both temporally and geographically at the accident scene from the DUI investigation, about which Officer Helfrich was questioned at trial.

The questions Helfrich asked defendant during the DUI investigation, and his responses to those questions, involved defendant's physical and mental condition. As Helfrich explained, the questions were designed to provide context for a field sobriety test; if an answer to a question revealed a defendant had a head trauma, for example, it would affect how the officer conducted the field sobriety test. The prosecutor likewise solicited the statements to establish defendant's physical condition while he was driving. Defendant's statement about veering off the road, on the other hand, was not about his current physical state or the injuries he sustained during the collision. Rather, it explained the actions he had taken moments before he crashed his car.

Nor, as the trial court observed, were the statements offered into evidence only a part of Helfrich's DUI interview, such that their admission would create an incomplete record or a misleading impression. Pursuant to his training, Helfrich conducted a

8

collision investigation first, near defendant's vehicle. He then moved defendant over to his patrol car to complete a DUI investigation. The People only elicited testimony about the DUI investigation on direct examination and defendant makes no assertion that any of his statements during that interview were omitted during Helfrich's testimony.

The questions Officer Helfrich asked were standardized questions written on a small card the officer regularly carried. In every DUI investigation he conducted, he asked the same questions in the same order, and he went through defendant's responses to each of those questions at trial. The questions and the responses were simple and straightforward. For example, Officer Helfrich asked, "[Have] you been drinking?" and defendant replied that "he had been drinking beer." In another exchange, the officer asked defendant "when he had started drinking," and the officer indicated that defendant responded he had "started at 1900 hours, which would be 7:00 p.m." These responses are " 'independently comprehensible,' " and defendant's earlier statement during the collision investigation was unnecessary to make them understood. (*People v. Farley* (2009) 46 Cal.4th 1053, 1103.) The trial court therefore did not abuse its discretion when it precluded the admission of defendant's statement given during the collision investigation concerning the reason he swerved off the road.[8]

II

*Restitution for Future Lost Wages*

Defendant separately argues insufficient evidence supports the trial court's order awarding restitution for the victim's future income loss. In particular, defendant asserts, the trial court assumed a much higher rate of base pay for the victim in the future, in

---

[8] We likewise reject defendant's conclusory argument that his Fourteenth and Sixth Amendment rights were violated by the purported exclusion. (*People v. Jones* (2013) 57 Cal.4th 899, 957 ["the routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights"].)

contrast to the victim's base pay rate for past income losses, without any evidentiary support for such an increase. We agree.

"[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (Pen. Code, § 1202.4, subd. (f).) The restitution order "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." (Pen. Code, § 1202.4, subd. (f)(3).) "[D]irect victims of crime have a statutory right to restitution on the full amount of their losses without regard to the full or partial recoupment from other sources (except the state Restitution Fund)." (*People v. Baker* (2005) 126 Cal.App.4th 463, 468.)

At a victim restitution hearing, the People may make a prima facie case for restitution based on the victim's testimony or on some other claim or statement as to the amount of his or her economic loss. (*People v. Millard* (2009) 175 Cal.App.4th 7, 26 (*Millard*).) Once the People have made a prima facie case for restitution, " 'the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim.' " (*Ibid.*; see *People v. Giordano* (2007) 42 Cal.4th 644, 664.) The standard of proof at the hearing is preponderance of the evidence. (*Millard, supra*, at p. 26.)

We review the trial court's restitution order for abuse of discretion. (*People v. Giordano, supra*, 42 Cal.4th at p. 663.) We presume the judgment correct, and to set it aside an appellant must affirmatively show error. (*Id.* at p. 666.) "No abuse of [ ] discretion occurs as long as the determination of economic loss is reasonable, producing a nonarbitrary result." (*Id.* at p. 665.) If the court used a rational method of determining the victim's loss, so that the order is not arbitrary or capricious, we will uphold the order. (*Ibid.*; *People v. Garcia* (2011) 194 Cal.App.4th 612, 617.) " ' "If the circumstances

10

reasonably justify the [trial court's] findings," the judgment may not be overturned when the circumstances might also reasonably support a contrary finding. [Citation.] We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact. [Citation.]' [Citation.]" (*Millard, supra*, 175 Cal.App.4th at p. 26.)

When the trial court ordered victim restitution, it did not explain its method for calculating the amount of future lost income, but stated it was adopting the prosecution's claim "in all respects except for the medical bills." The prosecution's calculations, however, assumed the victim would earn $150,000 per year, or $12,500 per month, in the future, despite also concluding the victim had earned $6,000 per month before he was injured and $5,000 per month after he had returned to work from the injury. No explanation was given for this increase and it is unsupported by any evidence in the record.

In fact, the testimony at the restitution hearing appears to preclude the possibility the victim could earn $150,000 per year in the future. The victim's wife testified the restaurant had a gross income of approximately $320,000 per year before the accident. The victim and his wife split the restaurant's net income equally between themselves as wages. For the victim to earn $150,000 per year under these circumstances, the restaurant would thus need to have only $20,000 in expenses per year. But the victim's wife testified the restaurant had approximately $15,000 in expenses *per month*. Moreover, she explained the gross income had decreased since the accident, while the monthly expenses had increased.

The People suggest an alternative method to reach the sum ordered in the trial court's victim restitution order. They argue the victim paid himself at a rate of $25 per hour and was only able to work two or three hours a day after the accident. Thus, the trial court could calculate the amount of the victim's loss by multiplying $25 by the number of hours in a year, assuming a 12- or 13-hour workday because that is the number

11

of hours he is no longer able to work.[9]  This results in a net loss of $109,500 or $118,625 per year, respectively.

But this explanation assumes the victim would work 16 hours per day, 365 days per year, which is not supported by the record.  Although the victim stated he sometimes worked up to 16 hours per day before the accident "depending on what we are doing," he testified he "[n]ormally" worked "8 to 12 hours" and would work 8 hours "in a typical day."  And, the victim's testimony that he earned $6,000 per month already incorporated changes in his pay based on the number of hours he worked.  Likewise, the People's method adopts $25 per hour as the victim's future pay rate, despite the fact the prosecution previously discounted the pay rate to $21 per hour for the more recent period after the victim returned to work following the accident to account for the decrease in the restaurant's net income.  The People do not provide any reason why the victim's future income projections would so sharply depart from the past income figures, and we can find no plausible, nonarbitrary explanation for the increase.  We will reverse the restitution order with respect to the victim's future lost income and remand the matter for further proceedings.

---

[9]      A 12-hour workday for 365 days in a year is 4,380 work hours and a 13-hour workday for 365 days is 4,745 work hours.

DISPOSITION

The restitution order is reversed to the extent it awarded restitution for the victim's future income losses and the matter is remanded to the trial court for further proceedings consistent with this opinion.  In all other respects, the judgment is affirmed.


      KRAUSE      , J.


We concur:


      MURRAY      , Acting P. J.


      DUARTE      , J.

13